# EXHIBIT "A"

# IN THE CIRCUIT COURT OF WASHINGTON COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

**RANDY L. ADAMS,**
**DAVID J. AMONS,**
**FREDDIE BOLTON, JR.,**
**WILEY BROOKS, JR., INDIVIDUALLY AND AS REPRESENTATIVE**
**OF THE ESTATE OF WILEY BROOKS,**
**CLARENCE EDWARD BRYANT, SR.,**
**JESSIE L. CARTER, JR.,**
**SHURMON CHAFFEE,**
**ZADIE DYKES, INDIVIDUALLY AND AS REPRESENTATIVE**
**OF THE ESTATE OF BILLY E. DYKES,**
**CHARLIE HARRIS, JR.,**
**WALTER L. MCCOY,**
**PENELOPE MCCOY, INDIVIDUALLY AND AS REPRESENTATIVE**
**OF THE ESTATE OF WILLIE J. MCCOY,**
**ANNIE PEARL NEVELS, INDIVIDUALLY AND AS REPRESENTATIVE**
**OF THE ESTATE OF LOUIS NEVELS,**
**SELMOND NORALS,**
**RANDOLPH PERRYMAN,**
**JEAN Y. PEYREGNE,**
**JOHN ALEXANDER PRINE,**
**LARRY NOBLE SEWELL, SR.,**
**LUTHER THREET, AND**
**BERDELL WILLIS**

CAUSE NO. 2016-0032 CF

**PLANITIFFS**

**VS.**

**JOHN M. O'QUINN & ASSOCIATES,**
**PLLC D/B/A THE O'QUINN LAW**
**FIRM, JOHN M. O'QUINN &**
**ASSOCIATES L.L.P., JOHN M.**
**O'QUINN, P.C., JOHN M. O'QUINN**
**LAW FIRM, PLLC, T. GERALD**
**TREECE, INDEPENDENT EXECUTOR**
**OF THE ESTATE OF JOHN M.**
**O'QUINN, DECEASED, RICHARD N.**
**LAMINACK, JOE GIBSON,**
**DANZIGER & DE LLANO, LLP,**
**and ABEL MANJI**

Received & Filed

MAR 1 4 2016

Barbara Esters Parker

By: _____ D.C.

**DEFENDANTS**

## PLAINTIFFS' COMPLAINT

COME NOW Plaintiffs, **RANDY L. ADAMS, DAVID J. AMONS, FREDDIE BOLTON, JR., WILEY BROOKS, JR.,** INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF **WILEY BROOKS, CLARENCE EDWARD BRYANT, SR., JESSIE L. CARTER, JR., SHURMON CHAFFEE, ZADIE DYKES,** INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF **BILLY E. DYKES, CHARLIE HARRIS, JR., WALTER L. MCCOY, PENELOPE MCCOY,** INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF **WILLIE J. MCCOY, ANNIE PEARL NEVELS,** INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF **LOUIS NEVELS, SELMOND NORALS, RANDOLPH PERRYMAN, JEAN Y. PEYREGNE, JOHN ALEXANDER PRINE, LARRY NOBLE SEWELL, SR., LUTHER THREET,** AND **BERDELL WILLIS,** hereinafter referred to as "Plaintiffs," and files this Complaint against **JOHN M. O'QUINN & ASSOCIATES, PLLC D/B/A THE O'QUINN LAW FIRM, JOHN M. O'QUINN & ASSOCIATES L.L.P., JOHN M. O'QUINN, P.C., JOHN M. O'QUINN LAW FIRM, PLLC., RICHARD N. LAMINACK, JOE GIBSON, DANZIGER & DE LLANO, LLP,** and **ABEL MANJI** hereinafter collectively referred to as Defendants, and would respectfully show as follows:

### I.
### PLAINTIFFS

1.     Plaintiffs are all individuals and residents of Mississippi or Alabama.

### II.
### DEFENDANTS

2.     JOHN M. O'QUINN & ASSOCIATES, PLLC D/B/A THE O'QUINN LAW FIRM is a Professional Limited Liability Company formed and doing business in Texas and may be served with process by serving its registered agent, David L. Griffis, at 1401 McKinney Street, Suite 1700, Houston, Texas 77010.

3.      JOHN M. O'QUINN & ASSOCIATES L.L.P. is a Limited Liability Partnership formed and doing business in Texas and may be served with process by serving its managing partner, Christian Steed, at 1170 Silber Rd., Houston, Texas 77055.

4.      JOHN M. O'QUINN, P.C., is a Professional Corporation formed and doing business in Texas and may be served with process by serving its managing partner, Christian Steed, at 1170 Silber Rd., Houston, Texas 77055.

5.      JOHN M. O'QUINN LAW FIRM, PLLC is a Professional Limited Company formed and doing business in Texas and may be served with process by serving its managing partner, Christian Steed, at 1170 Silber Rd., Houston, Texas 77055.

6.      T. GERALD TREECE, AS INDEPENDENT EXECUTOR OF THE ESTATE OF JOHN M. O'QUINN, DECEASED, is the executor and personal representative of the ESTATE OF John M. O'Quinn, deceased, citizen of Texas, and may be served by serving T. Gerald Treece at his principal place of business, 1303 San Jacinto Street, Houston, Texas 77002.

7.      RICHARD N. LAMINACK, is an individual citizen of Texas and can be served with process at his office address, Laminack Pirtle & Martines, LLP, 5020 Montrose Blvd # 900, Houston, Texas 77006.

8.      JOSEPH GIBSON is an individual citizen of Texas and can be served with process at his office address, Law Office of Joseph V. Gibson, P.C., 118 Vintage Park Blvd., Suite W-125, Houston, Texas 77070.

9.      DANZIGER & DE LLANO, LLP is a Limited Liability Partnership formed and doing business in Texas and may be served with process by serving its partner, Paul Danziger, at 440 Louisiana St # 1212, Houston, Texas 77002.

10.     ABEL MANJI is an individual citizen of Texas and can be served with process at his home address, 4314 Mildred, Bellaire, Texas 77401.

## III.
## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to Mississippi Code Ann. §13-3-57 in that Defendants were all doing business in Mississippi at all times pertinent to this action. Specifically, this action involves contracts with residents and non-residents of Mississippi performed in whole or in part in Mississippi, and further involves torts committed in whole or in part in Mississippi against residents and non-residents of Mississippi.

12.     Venue is proper in the Circuit Court of Jasper County, First Judicial District pursuant to Mississippi Code Ann. §11-11-3, as Defendants committed substantial acts and omissions as to all Plaintiffs in Jasper County, and substantial events that caused the Plaintiffs' economic injuries occurred in Jasper County.

## IV.
## FACTS & ALLEGATIONS

13.     This case is one of many claims filed against the O'Quinn Law Firm and related entities and persons by their former clients relating to underlying silica litigation. The underlying silicosis litigation originated in the early 2000s when out-of-state law firms came into Mississippi, solicited Mississippians as mass tort plaintiffs, and flooded Mississippi courts with both resident and out-of-state plaintiffs.

14.     This specific case arises out of the malfeasance committed by The O'Quinn Law Firm ("O'Quinn" or the "Firm"), its attorneys, and co-counsel during the representation of thousands of clients who were diagnosed with silicosis and/or silica-related diseases. For over ten years, O'Quinn, at the leadership of its principle attorneys, John M. O'Quinn ("Mr.

O'Quinn") and Richard Laminack ("Laminack") in addition to the medical experts hand-selected by the Firm, led clients, the judicial system, defendants in the underlying case, and opposing counsel to believe that its clients had silicosis in order to generate millions of dollars in attorneys' fees and expenses. Ultimately, Mr. O'Quinn, Laminack, the Firm, and its attorneys placed their interests (and the interests of the screening companies involved) above those of its clients. This is the sad reality of O'Quinn's approach to mass tort litigation and this is the story of the residual victims of that approach, their clients.

15.    Plaintiffs herein hired The O'Quinn Law Firm, in addition to referring law firms and individual lawyers regarding silica-related claims. Thus, Defendants owed Plaintiffs numerous duties of care and conduct as a matter of law. Defendants selected medical professionals to screen Plaintiffs for silica related injuries and these professionals diagnosed Plaintiffs with a silica related injury.

16.    O'Quinn represented approximately three thousand (3,000) clients who were occupationally exposed to silica-containing products and materials and diagnosed as having silica-related diseases (hereinafter the "Silicosis Clients") against numerous manufacturers and distributors of silica-related products, materials and/or protective equipment (hereinafter the "Silicosis Defendants"). Plaintiffs, like other Silicosis Clients, were solicited by attorneys and other individuals, law firms, or screening companies to undergo medical screening to determine if they had silicosis. Plaintiffs were then solicited to enter into contracts with law firms who promised to litigate their silicosis claims against the Silicosis Defendants. These entities subsequently referred Plaintiffs to O'Quinn. As much as 98% of O'Quinn's silicosis docket came from referring law firms. The referring law firms included Danziger & De Llano

("Danziger") and others, who are jointly responsible for any wrongful acts committed by O'Quinn or its attorneys.

17.     Plaintiffs initially signed contingency fee contracts with either one of the referring lawyers or signed the initial contract directly with O'Quinn and/or O'Quinn's related entities.[1] All Plaintiffs ultimately signed contracts directly with O'Quinn.   The contract signed by Plaintiffs with O'Quinn hired the Firm on a contingency fee basis and issued the Firm a Power of Attorney ("POA") to represent them in any and all claims against the Silicosis Defendants.

18.     During the early 2000s, O'Quinn filed lawsuits against numerous Silicosis Defendants.   Of their three thousand (3,000) Silicosis Clients, O'Quinn filed roughly one thousand (1,000) of these Silicosis Clients' cases in Texas state court.   The majority of the other cases were filed in various Mississippi circuit courts.   Many of these cases were transferred to the Multi-District Litigation No. 1553 ("MDL") before ultimately being remanded back to Mississippi state court.   Plaintiffs in this lawsuit have all had their cases filed in Mississippi state court.

19.     Among the attorneys working on the Silicosis docket at O'Quinn were Mr. O'Quinn, Laminack, and Joe Gibson ("Gibson").   When one or more of these attorneys departed the Firm, Abel Manji ("Manji") and then Mike Lowenberg ("Lowenberg") took over the day-to-day operations of the silicosis docket. Christian Steed ("Steed") eventually acted as the managing attorney over the entire firm, including the mass-tort division.

20.     Early on in the underlying silica litigation, and sometime even prior to the POAs being signed, O'Quinn, Laminack, and/or Gibson, all under the direction and supervision of Mr. O'Quinn, either personally or through medical screening companies or referring lawyers, would

---

[1] The O'Quinn Law Firm has also been known as John M. O'Quinn & Associates, PLLC and/or O'Quinn, Laminack & Pirtle, among other names.

advise the Silicosis Clients, including Plaintiffs, to travel to various places throughout Mississippi to undergo medical exams by screening companies and medical professionals hand-picked by the Firm and its attorneys. These screening companies included N&M, Inc. (hereinafter "N&M") and Respiratory Services, Inc. (hereinafter "RSI"), who had mobile screening trailers that would travel to various locations to perform the screenings which often occurred in the parking lot of hotels, strip malls, or restaurants.

21.    In January 2002, attorneys at O'Quinn received a memorandum from N&M, outlining the "list of charges [the attorneys had] requested." The charges read:

| | |
|---|---|
| Chest x-ray | $35 |
| B-read | $45 |
| Full exam medicals with PFT | $300 |
| **Full exam medicals with PFT (N&M refers)** | **$650** |
| Re-reads | $35 |

According to the memo, if N&M, a non-lawyer, referred a client to O'Quinn, the Firm, or necessarily the referring attorneys, would pay N&M an additional $350 referral fee for the case. Such conduct violates all applicable Rules of Professional Conduct in both Mississippi and Texas. These transactions occurred on numerous occasions and several Plaintiffs were charged the entire $650 to $750 as expenses in their case. Thus, not only did the Firm (or the referring attorneys) pay N&M an extra $350 to $450 to "buy" Plaintiffs as clients, but the Firm then turned around and billed the extra $350 to $450 to Plaintiffs as expenses in their case. Additionally, for several of the Plaintiffs, the Firm (or the referring law firm) would lure Plaintiffs into the screenings with advertisements for "free" silicosis screenings, but then billed the entire amount of the screening, including the referral fee paid to N&M, to Plaintiffs. This conduct was unethical and was a breach of fiduciary duty.

22.    With respect to Texas ethical rules, pursuant to Rule 7.06 of the Texas Disciplinary Rules of Professional Conduct, the Firm and its lawyers, as well as the referring attorneys, were mandated to immediately withdraw from the representation of every client that was referred to them by N&M in violation of Rule 7.03.   Therefore, all fees and expenses obtained from these clients were obtained illegally and thus, should be disgorged pursuant to the doctrine that one should not profit or gain from their own wrongdoing.

23.    Under the direction of the Firm or the referring law attorneys, N&M and/or RTS and its staff would often perform the initial X-Ray and Pulmonary Function Tests ("PFTs") on Plaintiffs, both of which were required to make a diagnosis of silicosis.   O'Quinn and its staff would collect the occupational and exposure histories from the Plaintiffs required to make the diagnoses.   All of this information would then be provided to the medical professionals hand selected by the Firm and its attorneys and the referral lawyers including, initially, Dr. Ray Harron, Dr. Andrew Harron, Phillip H. Lucas and Dr. Barry Levy, among others.   These medical professionals provided the Firm with medical reports and opinions diagnosing Plaintiffs with silicosis and various silicosis-related diseases including Lupus, Tuberculosis, Rheumatoid Arthritis, Scleroderma or even Lung Cancer.   Over the course of the silica litigation, the Firm paid millions of dollars to Dr. Harron and N&M for their medical screenings, reports and referrals.

24.    O'Quinn used these reports in the underlying litigation against the Silicosis Defendants, continuously and vehemently representing to the courts in the underlying case that Plaintiffs had all been diagnosed with silicosis and were suffering injury.   In fact, Laminack, O'Quinn's managing partner of the mass-tort division, testified, under oath, that he "would never

knowingly bring a silicosis claim on behalf of an individual that does not have the fundamental proof of such a claim."[2]

25.    After filing the silicosis lawsuits, O'Quinn utilized Dr. Harron's reports to obtain "global settlements" from some of the underlying defendants.  By January of 2004, O'Quinn had entered into global settlements with underlying defendants Moldex, 3M, Air Liquide, Halliburton, and Clemtex which, if properly processed, would have totaled over $55 million dollars.  The settlements were typically based on various factors, including the clients' exposure history with each Silicosis Defendants' product, the clients' lung function to radiographic reading (or "ILO reading"), and whether the client had been diagnosed with any diseases linked to silicosis such as Lupus, Tuberculosis, Rheumatoid Arthritis, Lung Cancer, or Scleroderma, just to name a few.

26.    Although O'Quinn began receiving the settlement funds for different Silicosis Defendants as early as 2002, O'Quinn and its attorneys wrongfully retained the settlement proceeds for their own use.  O'Quinn and its attorneys failed to distribute the funds in a timely manner or apply the proceeds to the expenses, thus forcing the Silicosis Clients, including Plaintiffs, to incur unnecessary interest and unnecessary costs for future expenses had the funds been distributed timely.

27.    For example, O'Quinn received settlement money and negotiated settlements from a number of Silicosis Defendants in late 2002 and early 2003.  However, by February 2004, Defendants still had not disbursed any of the settlement proceeds to Plaintiffs.  Even more egregious, whenever various Silicosis Clients would call O'Quinn to inquire about their

---

[2] See STAFF OF H. COMM. ON ENERGY & COMMERCE, MEMORANDUM TO THE SUBCOMM. ON OVERSIGHT AND INVESTIGATIONS: 109TH CONG., OVERSIGHT AND INVESTIGATIONS HEARINGS: —THE SILICOSIS STORY: MASS TORT SCREENING AND THE PUBLIC HEALTH, FOURTH DAY OF HEARINGS (Comm. Print July 26, 2006) at 402.

settlements, the staff, including Laminack, Steed and others, under the direction of Mr. O'Quinn would, directly or indirectly, make misrepresentations concerning the clients' settlements rather than tell the clients the truth and issuing a disbursement. Indeed, despite having clients' settlements in O'Quinn's possession for months upon months, one of the attorneys, Tracy Molter, requested permission to disburse partial funds to the clients because she was simply "running out of things to tell these folks." It is obvious that the Firm under the direction of Mr. O'Quinn, Laminack, Steed, Gibson and any other attorney managing or working the silicosis docket, held Plaintiffs' funds hostage in order to pay future expenses and interest to the benefit of the Firm and to the detriment of Plaintiffs.

28.     Another serious breach of duty related to Defendants' deduction of "general expenses." O'Quinn charged Plaintiffs an arbitrary 3% of their general expenses and sometimes forced the Plaintiffs to sign affidavits *subsequent to the original fee agreement* agreeing to have "Silica General Expenses" and the arbitrary 3% pro-rata portion of these general expenses deducted from their settlements, prior to O'Quinn releasing any of their settlement funds. Thus, O'Quinn and its attorneys held Plaintiffs' settlement funds hostage unless they signed a *new agreement* consenting to a 3% pro-rata general expense charge.

29.     Realizing they needed to disclose the "Silica General Expenses" charge in the contract, O'Quinn changed the language of their subsequent silicosis agreements to include vague disclosure of such the deduction of general expenses. Thereafter, some Plaintiffs signed agreements with O'Quinn containing the new language. However, prior to signing the agreements with O'Quinn, many of the Plaintiffs had already entered into contingency fee agreements with the referring lawyers, including Danziger, and various referring attorneys. The prior agreements entered into with the referring attorneys mentioned nothing about the general

expenses. Still, the referring lawyers, including Danzinger, as well as O'Quinn, had Plaintiffs sign the new *subsequent* agreement with O'Quinn which materially altered the terms of the prior agreement and contained the "general expense" language. Neither O'Quinn nor the referring lawyers disclosed the pros and cons or the advantages and disadvantages of this new subsequent agreement. Furthermore, Plaintiffs were never advised to seek outside counsel prior to entering into these new agreements, nor was the new subsequent agreements fair and reasonable to Plaintiffs.

30.     In addition, the Firm billed a "huge number" of client case-specific charges to Silicosis General simply because "employees didn't take time to look up client case numbers." In the same regard, O'Quinn, under the management of Mr. O'Quinn and Laminack, permitted numerous charges to be billed to Silicosis General for work done in the one group of state's cases that had nothing to do with the other state court litigation. Thus, Plaintiffs who were never part of the Texas litigation were charged expenses for their cases that were never actually incurred for their cases. These excess charges were never disclosed to Plaintiffs and Plaintiffs were never reimbursed for these excess charges. Thus, the Firm breached its fiduciary duties to Plaintiffs.

31.     By 2003, the litigation expenses for O'Quinn's silicosis docket was "out of control." Just two years into the litigation, expenses for the 3,000 clients amounted to over $10 million dollars. Approximately $1.7 million was paid to the referral lawyers such as Danzinger & De Llano for screening cases and hundreds of thousands went to N&M for screening and referring O'Quinn the cases. Rather than spend money on securing evidence of liability, O'Quinn, led by Mr. O'Quinn and Laminack, squandered hundreds of thousands of dollars through frivolous conduct. The Firm billed its overhead as "expenses" to the clients. In fact, the

Firm billed Mississippi Bar Admission fees, office supplies, pens, paper, folders and other office items as "expenses." In just one instance, the Firm spent over $60,000.00 on an "elaborate" database to manage the silicosis docket that not one employee ever put a scrap of information into, other than general contact information already contained in other databases. Additionally, employee travel expenses were overly excessive. There were dinner tabs for $1,000.00, $100.00 bottles of wine and liquors, and expensive cigars, all of which were billed to the clients, including Plaintiffs and charged to Silicosis General. There were also hotel charges at various casinos in Mississippi and Las Vegas billed to Silicosis General. Moreover, instead of flying coach, employees of the Firm would upgrade to first-class and simply bill the clients, including Plaintiffs. Mr. O'Quinn also billed thousands of dollars in flights on his private jet to the Silicosis General file.

32.     Additionally, the Firm's attorneys, all under the management of Mr. O'Quinn and Laminack, unreasonably increased the expenses in the silicosis cases through carelessness and disregard. These attorneys hired medical experts and paid up-front fees of $20,000.00 or more to render an expert report only to find out that the experts were not qualified experts in the first place, or that they were not the type of experts that the Silicosis Defendants required in order to settle. Despite those facts, O'Quinn still billed these charges to Plaintiffs and other Silicosis Clients. Further, the Firm incurred "thousands and thousands of dollars" in unnecessary hotel and meeting room costs caused by the Firm's employees scheduling depositions for plaintiffs and fact witnesses and then canceling said depositions because the Firm's employees simply did not want to attend. Mr. O'Quinn and Mr. Laminack permitted such conduct to occur. More egregious however is that O'Quinn and its attorneys would (on numerous occasions) bill two-to-three day trips as expenses to cover a hearing that lasted only a few hours. All these charges

were billed to Silicosis General of which Plaintiffs had to pay their arbitrary, non-authorized 3% share.

33.     Aside from the expense-related errors mentioned above, the Firm at the hands of Laminack, and Gibson, and under the management of Mr. O'Quinn, committed numerous errors while processing a number of the settlements with the Silicosis Defendants. Due to O'Quinn's delay, many Plaintiffs who had both asbestosis and silicosis cases were denied their higher silicosis claim with defendants like 3M and Halliburton because their asbestosis attorney would settle the asbestosis claim and the client would execute a release the underlying defendant from liability for the pending silicosis claim. This occurred because of O'Quinn's unreasonable delay in processing the settlements and because its attorneys wholly failed to communicate with the asbestosis attorneys, investigate the clients other competing claims, or otherwise ensure that their clients would receive the higher claims.

34.     In addition, the Firm improperly, and in violation of the rules governing professional conduct, failed to fully investigate and assess individual claims and entered into "aggregate" or "global" settlements with 3M for approximately $26 million, and then intimidated or coerced Plaintiffs into the settlement. The Firm took this action, even though the Firm and the attorneys therein knew that the way they were handling the aggregate settlements were prohibited. *See, e.g., Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999). The Firm and its attorneys made no individual negotiations on behalf of Plaintiffs and, even knowing potential "*Arce* issues" were present, signed off on the settlement without following the dictates of *Arce*.

35.     Further, the Firm continuously permitted Plaintiffs' claims to be wrongfully dismissed against a number of Silica Defendants. In 2004, the Firm and its attorneys, including Laminack, were aware that numerous Silicosis Clients' cases had been wrongfully dismissed

before releases had been signed or settlements had been paid. Yet, the Firm and its employees chalked them off as a loss and did not "waste time checking every lawsuit [they] filed against the Court records to see which cases have or have not been dismissed." Instead, they figured "[w]hat's done is done." These wrongful dismissals were never disclosed to the effected Silicosis Clients.

36. Moreover, numerous Silicosis Defendants filed motions for summary judgment which were easily controverted. However, the Firm and its attorneys wholly failed to respond to these motions and instead simply dismissed the viable cases against those Silicosis Defendants or simply did not file a response because it was too bothersome.

37. Additionally, the Firm, under the direction of Mr. O'Quinn and Laminack, failed to file Verified Fact Sheets ("Fact Sheets") for approximately 223 clients, as required by the Court in the MDL. As a result, these clients' cases were prejudiced and, based on information and belief, dismissed. When asked by Laminack why the Fact Sheets were not filed, "no one ha[d] an answer." Recognizing the problem, Laminack stated in a silicosis meeting on January 5, 2005, "if we have 200 cases dismissed because we didn't do our homework is [sic] a real problem because we don't have that much malpractice coverage." Although recognizing the obvious problem, these dismissals were never disclosed to the effected Silicosis Clients, which may include Plaintiffs. Upon information and belief, this allegation relates to the named Plaintiffs in this case.

38. Furthermore, the Firm failed to process and/or finalize settlement agreements. In his February 25, 2005 resignation letter to Laminack, Joseph Gibson, one of the Firm's employees, uttered the inevitable truth affecting the Firm's silicosis docket: "[w]e are going to lose every settlement we have made because we won't process them." This is exactly what

happened to the Firm's settlements with silica defendants, Sanstorm, Moldex, and many others. The vast majority, if not all, of the Plaintiffs were entitled to settlement proceeds with Sanstorm (also known as Air Liquide). On November 7, 2002, O'Quinn attorney Thomas Pirtle, on behalf of the Firm, entered into a Rule 11 Agreement with Sanstorm. The settlement with Sanstorm was for approximately $5,250,000.00. By February 25, 2005, Gibson informed Laminack that "Sandstorm [sic] will stand by their settlement if we send it out now." However, the Firm never distributed the paperwork and the clients therefore never received any settlement proceeds from Sanstorm. Had the Firm simply enforced the Rule 11 Agreement and processed the settlement, Plaintiffs would have obtained their portion of the settlement. Neither the Firm, its attorneys, nor the referring lawyers ever disclosed the missed Sanstorm settlement to Plaintiffs.

39.     The Firm similarly breached its duties to Plaintiffs with respect to underlying silica defendant Moldex. On November 1, 2003, Moldex and the Firm entered into a settlement agreement. The Firm settled its claims with Moldex for approximately $2,250,000.00. Moldex was willing to pay the Firm for the clients who had executed releases, even though the Firm had not satisfied the "quota" for a global settlement. Thus, all the Firm had to do was send the releases and the paperwork to Plaintiffs to be filled out and then forward the releases to Moldex for payment. In many instances, the Firm sent Plaintiffs releases which were filled out and sent back to the Firm. However, attorneys at the Firm never timely processed or enforced the settlement with Moldex during 2003 or 2004. When Mr. Manji joined the Firm, he attempted to re-send the Moldex releases, but was told that because the doctors used in the clients' medical reports had been discredited in the MDL's *Daubert* proceedings, they were not going to proceed with the settlement. However, had the Firm simply processed the Moldex settlement in a timely manner and sent the releases to Moldex, Plaintiffs would have received these settlement

proceeds. Again, the Firm, its attorneys, and the referring lawyers failed to disclose the missed opportunity of the Moldex settlement to Plaintiffs. Rather, they intentionally and fraudulently concealed this fact from Plaintiffs to avoid liability.

40. The above settlements are likely not the only ones that Plaintiffs failed to receive due to the Firm's delay in processing and litigating their claims. Thus, Plaintiffs here seek any and all claims and monies they were entitled to and would have received but for Defendants' delay. And although the settlements with Sanstorm and Moldex were entered into but negligently never processed, the Firm and its attorneys fraudulently concealed the missed settlements from their clients. Specifically, in at least one instance, Laminack signed an affidavit expressly stating there were no other settlements for these clients.

41. Furthermore, the Firm and its attorneys failed to ensure that those Plaintiffs with Lupus, Tuberculosis, Rheumatoid Arthritis, Lung Cancer, or Scleroderma (the "Big 5" diseases), received the proper settlement amounts from the settling Silicosis Defendants. For instance, Silicosis Defendants Halliburton, 3M and Moldex would pay Plaintiffs higher settlement amounts if they had a medical report linking one of the foregoing Big 5 diseases to silicosis. Many Plaintiffs had such reports and medical documentation. However, the Firm and its attorneys failed to ensure that such reports were submitted and that Plaintiffs received the appropriate (and much greater) settlement amounts.

42. In early 2005, the MDL Court conducted various *Daubert* hearings on the reliability of the doctors used by O'Quinn and also considered the underlying defendants' Motion for Sanctions. This caused many of the referring attorneys to withdraw from the Plaintiffs' silica cases. For instance, Grenfell, Sledge & Stevens, PLLC withdrew from the cases in 2005 or 2006 and refunded all the expenses they had once charged, along with any attorneys'

fees they had collected, back to O'Quinn. This occurred in 2005 to 2006. Rather than immediately refund the Grenfell, Sledge & Stevens expenses and attorneys' fees to the Plaintiffs, O'Quinn wrongfully retained this money, never disclosing to Plaintiffs that the excess expenses were returned and in their possession.

43.     The Grenfell, Sledge & Stevens expense issue was not the only instance where O'Quinn attempted to convert Plaintiffs' funds to their own use. In the bankruptcy proceedings with Halliburton, the bankruptcy court withheld a small portion of each claimants' settlement to administer the claims, known as the Halliburton 2nd payment. Although the Firm received these remaining funds from the Halliburton bankruptcy proceedings in December 2005, the Firm never disbursed the Halliburton 2nd payment to Plaintiffs. Instead, the firm withdrew from the Plaintiffs' cases and, under the direction of Mr. O'Quinn, Laminack and Steed, purposefully held onto the funds, converting them to its own use. While the wrongful withholding of the Halliburton 2nd payment affected virtually all of the Plaintiffs, there are numerous specific instances where the same type of wrongful conduct occurred with various Plaintiffs' individual settlements. As discovery progresses, these individual instances will be specified.

44.     After the *Daubert* hearings in the MDL occurred, Gibson and Laminack, left the Firm. Thereafter, O'Quinn hired Manji to take over the silicosis docket. Although they knew of the issues surrounding the silicosis docket, neither Laminack nor Mr. O'Quinn advised Manji of the deplorable conduct committed by them and the Firm as outlined above. Manji discovered the issues over the next few years of his employment, with apparently no help from his colleagues or current and former members of the Firm, by digging through various boxes that were randomly and anonymously, left outside his office door over the course of seven years.

45.     By deception and purposeful concealment, the N&M referral fees went under the radar for several years until Manji discovered the issue in June or July of 2008. At the time he first discovered the issue, he thought they were just overcharges. In August of 2008, Manji had a meeting with Steed, the Firm's managing attorney, about the overcharges and/or referral fees. At first, Steed was very concerned about the issue. Manji looked into the issue further and by early 2009 found that everything he was told by Patricia Hilliard, a former employee of the Firm, was true – that is, former employees of the Firm, Mr. O'Quinn and Laminack – were buying cases from N&M and its owner Heath Mason. Manji wrote a memo to Steed in January 2009 entitled "Bought silicosis cases" wherein he explained to Steed that Mr. Mason advised an employee at the firm that Gibson was buying cases from N&M, non-attorneys, and that Mr. Mason had personally talked to Manji and asked him if he knew that he – being Mr. Mason – was selling cases to the firm. Manji explained to Steed that there were approximately 1,580 silica cases that were purchased from N&M. In this memo, Manji, after a personal review of the records, explains "my fears that the allegations of bought cases are truer now than before. I will keep checking but it looks grim."

46.     By October of 2009, Steed had not allowed Manji to send a letter out advising the clients of the referral fees and overcharges. In December of 2009, Manji brought the issue to Steed's attention again but nothing happened. Finally, in January of 2010, Steed put Manji in contact with Professor Robert Schuwerk, the Firm's "hired gun" on ethics, to work on drafting a disclosure letter to the clients. Mr. Schuwerk approved Manji's letter that same month but the letter that Manji wrote, which was in plain language the clients could understand, never went out. Instead, in July of 2010, the Firm sent out a completely different "disclosure" letter informing the clients of the N&M issue. The letter, ultimately signed by Steed, was so inaccurate and

inadequate that Manji refused to sign off on it.  This is because the letter was so convoluted that even Manji, a highly-skilled silicosis attorney, could "barely understand what it says."  As written, Manji expressed that "none of [his] clients would even be able to understand [the] letter…" and that the "[w]hole letter [was] confusing to [him]."  Moreover, the letter contained numerous misrepresentations.  For instance, while the letter stated "we recently reviewed", Manji emphasized that the "issue is not recent. It happened in 2002 … I told them in 2008."

47.      Moreover, and even more egregious than the above, after a group of former Texas silicosis clients brought suit against O'Quinn for the foregoing conduct, Steed and Lowenberg and apparently others connected to the Firm set about a course of conduct to destroy, shred and alter documents contained in all of the Silicosis Clients' files, including Plaintiffs.  To conduct this enormous task, the Firm hired a temp service of approximately twenty people comprised of both lawyers and non-lawyers to alter the clients' files.  During this process, Manji witnessed "thousands" of documents being taken out of the silicosis clients' files and "thrown in the trash can" and "shredded" after the Texas litigation had ensued.  The document shredding and altering of the clients' files occurred day after day for several months over Manji's strong objection.  Manji strongly objected to Steed and other members of the Firm, including Dean T. Gerald Treece, the current Executor of Mr. O'Quinn's estate.  However, the spoliation of clients' files continued over Manji's objections to the contrary.

## V.
## <u>CAUSES OF ACTION</u>

48.      Based on the above, it has become necessary to bring this suit to collect a legal debt of money damages owing to Plaintiffs due to the conduct described herein. The Plaintiffs herein assert their entitlement to relief arising out of a series of similar transactions or occurrences, which have common questions of law or fact.  The conduct described herein

constitutes negligence, gross negligence, breach of fiduciary duty, breach of contract, constructive fraud, fraud, and negligent misrepresentation. Defendants Mr. O'Quinn and Laminack are also liable for negligent supervision.

### Legal Malpractice/Negligence

49.     In addition to the allegations and instances of malfeasance outlined above, the following errors and/or omissions constitutes negligence and fall below the standard of care for attorneys practicing law in Mississippi (and Texas): (1) Failure to diligently represent Plaintiffs in their Silicosis related claims; (2) Failure to preserve Plaintiffs claims, rights and defenses in their Silicosis related claims; (3) Failure to protect Plaintiffs interests in their Silicosis related claims; (4) Failing to obtain the proper experts and/or submit the proper expert reports or medical information on behalf of Plaintiffs to preserve his or her claims; (5) Failure to properly and timely procure and disburse settlement proceeds from the underlying Silicosis Defendants; (6) Failure to keep accurate billing and expense records; (7) Failure to properly and accurately deduct expenses; (8) Failure to properly inform Plaintiffs regarding the material facts of their case; (9) Failure to properly name viable underlying defendants.

50.     Of course, nothing Plaintiffs did, or failed to do, caused or in any way contributed to cause the occurrences that resulted in losses and damages to Plaintiffs.  On the contrary, the Defendants fell below the standard of care for attorneys practicing law in Texas and Mississippi, and thus, the Firm and its attorneys' conduct was a proximate and/or producing cause of Plaintiffs' losses and damages.

51.     Moreover, at all times material to the causes of action asserted herein, the Firm and its attorneys' conduct, as well as the conduct of the referring attorneys, were regulated by the Texas Disciplinary Rules of Professional Conduct and the Mississippi Rules of Professional

Conduct. The Firm and its attorneys' conduct, all or singularly, constitutes a violation of the several sections of the Texas Disciplinary Rules of Professional Conduct including but not limited to:

### TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT

**RULE 1.01     COMPETENT & DILIGENT REPRESENTATION**

(a) A lawyer shall not accept or continue employment in a legal matter which the lawyer knows or should know is beyond the lawyer's competence, unless:

> (1) another lawyer who is competent to handle the matter is, with the prior informed consent of the client, associated in the matter; or

> (2) the advice or assistance of the lawyer is reasonably required in an emergency and the lawyer limits the advice and assistance to that which is reasonably necessary in the circumstances.

(b) In representing a client, a lawyer shall not:

> (1) neglect a legal matter entrusted to the lawyer; or

> (2) frequently fail to carry out completely the obligations that the lawyer owes to a client or clients.

**RULE 1.03     COMMUNICATION**

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**RULE 1.04     FEES**

(a) A lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable fee. A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable.

…

(c) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

**RULE 1.14   SAFEKEEPING PROPERTY**

(a) A lawyer shall hold funds and other property belonging in whole or in part to clients … that are in a lawyer's possession in connection with a representation separate from the lawyer's own property. Such funds shall be kept in a separate account, designated as a trust or escrow account, maintained in the state where the lawyers office is situated, … Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person…a lawyer shall promptly deliver to the client … any funds … that the client … is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of funds or other property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interest. All funds in a trust or escrow account shall be disbursed only to those persons entitled to receive them by virtue of the representation or by law.

**RULE 1.15   DECLINING OR TERMINATING REPRESENTATION**

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned.  The lawyer may retain papers relating to the client to the extent permitted by other law only if such retention will not prejudice the client in the subject matter of the representation.

**RULE 3.04   FAIRNESS IN ADJUDICATORY PROCEEDINGS**

A lawyer shall not:

(a) unlawfully obstruct another party's access to evidence; in anticipation of a dispute unlawfully alter, destroy or conceal a document or other material that

a competent lawyer would believe has potential or actual evidentiary value; or counsel or assist another person to do any such act.

## RULE 8.04    MISCONDUCT

(a) A lawyer shall not:

(1) violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not such violation occurred in the course of a client-lawyer relationship;

(2) commit a serious crime , or commit any other criminal act that reflects adversely on the lawyers honesty, trustworthiness or fitness as a lawyer in other respects;

(3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

The Firm and its attorneys' conduct, as well as the referring attorneys' conduct, all or singularly, constitutes a violation of the following sections of the Mississippi Rules of Professional Conduct:

### MISSISSIPPI RULES OF PROFESSIONAL CONDUCT

#### RULE 1.1    COMPETENCE

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

#### RULE 1.3    DILIGENCE

A lawyer shall act with reasonable diligence and promptness in representing a client.

#### RULE 1.4    COMMUNICATION

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**RULE 1.5      FEES**

(a) A lawyer's fee shall be reasonable…

…

(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

**RULE 1.7      CONFLICT OF INTEREST: GENERAL RULE**

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless the lawyer reasonably believes:

> (1) the representation will not adversely affect the relationship with the other client; and
>
> (2) each client has given knowing and informed consent after consultation.

The consultation shall include explanation of the implications of the adverse representation and the advantages and risks involved.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless the lawyer reasonably believes:

> (1) the representation will not be adversely affected; and
>
> (2) the client has given knowing and informed consent after consultation.

The consultation shall include explanation of the implications of the representation and the advantages and risks involved.

**RULE 1.15      SAFEKEEPING PROPERTY**

(a) A lawyer shall hold clients' and third persons' property separate from the lawyer's own property. Funds shall be kept in a separate trust account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such trust account funds and other property shall be kept and preserved by the lawyer for a period of seven years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other

property the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

...

(j) A lawyer generally may not use, endanger, or encumber money held in trust for a client or third person without the permission of the owner given after full disclosure of the circumstances.

## RULE 1.16    DECLINING OR TERMINATING REPRESENTATION

(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

> (1) the representation will result in violation of the rules of professional conduct or other law...

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interest, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

## RULE 3.2    EXPEDITING LITIGATION

A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

## RULE 5.1    RESPONSIBILITIES OF A PARTNER OR SUPERVISORY LAWYER

(a) A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the rules of professional conduct.

(b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the rules of professional conduct.

(c) A lawyer shall be responsible for another lawyer's violation of the rules of professional conduct if:

(1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm or has comparable managerial authority in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

## RULE 5.4    PROFESSIONAL INDEPENDENCE OF A LAWYER

(a) A lawyer or law firm shall not share legal fees with a nonlawyer…

## RULE 7.1 COMMUNICATIONS CONCERNING A LAWYER'S SERVICES

A lawyer shall not make or permit to be made a false, misleading, deceptive or unfair communication about the lawyer or lawyer's services. A communication violates this rule if it:

(a) Contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading…

## RULE 8.4    MISCONDUCT

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

52.    The requirements of these rules above establish public policy against such conduct and their violation constitutes negligence as that term is understood in legal malpractice when supported by the expert opinion of an attorney familiar with the standard of care defined by these rules.

**Gross Negligence**

53.      The acts and omissions of Defendants as described herein constitutes gross negligence for which Plaintiffs now sue.  Defendants owed Plaintiffs a duty to render legal services with the care, skill and diligence of an attorney of ordinary and reasonable skill and knowledge.  Defendants failed to perform as attorneys of ordinary and reasonable prudence.  Moreover, however, Defendants wholly failed to uphold these duties.  Instead, Defendants chose to treat Plaintiffs with an entire want of care, such that Defendants' actions constitute an actual conscious disregard to the rights, welfare and safety of Plaintiffs.  Defendants' gross negligence proximately resulted in legal damages, for which Plaintiffs sue.

**Breach of Fiduciary Duty**

54.      An attorney client relationship existed between Plaintiffs, O'Quinn, the Firm's attorneys and the referral lawyers as a matter of law.  Thus, the Firm, Mr. O'Quinn, Laminack, Gibson, Lowenberg and Steed, as well as the referring firms owed Plaintiffs various fiduciary duties as a matter of law, including: (1) Duty to act with loyalty and utmost good faith and fair dealing; (2) Duty to act with absolute perfect candor, openness, and honesty, without any deception or concealment, no matter how slight; (3) Duty to be strictly honest about fee agreements and to refrain from self-dealing; (4) Duty to fully and fairly disclose to all Plaintiffs all matters material to the representation; (5) Duty to turn over funds belonging to Plaintiffs timely and promptly; (6) Duty to follow Plaintiffs' instructions; (7) Duty to make full and fair disclosure of the terms of a proposed settlement to Plaintiffs; (8) Duty to place the Plaintiffs' interests ahead of Defendants interests.

55.      The Firm, Mr. O'Quinn and other lawyers at the Firm intentionally breached these fiduciary duties as set out above. Specifically, these attorneys placed their own interests above

those of Plaintiffs and fell below the standard of conduct for attorneys practicing law in Mississippi (and Texas). This was accomplished by, among other things, (1) intentionally retaining settlement proceeds or other funds belonging to Plaintiffs; (2) charging excessive and/or unnecessary expenses; (3) charging Plaintiffs general case expenses for those expenses relating to *other* Silicosis Clients cases or cases relating to the Texas litigation rather than specifically to Plaintiffs; (4) intentionally concealing from Plaintiffs "problems" or "issues" that arose during the representation, including the disallowance of their settlements or bankruptcy claims and/or the dismissal of their case; (5) intentionally holding settlements hostage unless clients agreed to pay a 3% pro-rata share of the general expenses; (6) holding settlement funds to pay future expenses instead of timely distributing settlement funds to clients; (7) intentionally charging Plaintiffs interest on expenses while not paying them interest on settlements which Defendants wrongfully retained for several years in a devious money making scheme; (8) entering into new subsequent contracts with Plaintiffs permitting O'Quinn to deduct silicosis general expenses without advising Plaintiffs of the pros and cons, advantages, disadvantages, implications and nature of such subsequent agreement or advising them to seek outside counsel even when this new subsequent agreement was not fair and/or reasonable to Plaintiffs; (9) failing to withdraw from the representation of Plaintiff's as mandated by both Texas and Mississippi Rules of Professional Conduct; (10) deducting fees and expenses from Plaintiffs' settlements after the Firm withdrew from representing Plaintiffs; (11) soliciting business through a lay intermediary; (12) entering into aggregate or global settlements without any individual assessment of claims; (13) coercing Plaintiffs into the settlements; (14) destroying and altering Plaintiffs' litigation files, including documents which may show their misconduct, after the Texas litigation had ensued and knowing that litigation involving the Mississippi MDL may also

ensue; and (15) contacting represented clients outside their current councils purview even after being admonished not to contact the undersigned clients. The breaches described herein proximately caused Plaintiffs' damages for which they now sue.

## Breach of Contract

56.     The acts and omissions of the Firm as described above constitute breach of contract, for which Plaintiffs now sue.  The contingency fee contracts entered into between the Firm did not allow for the deduction of arbitrary, unreasonable, or excessive Silica General Expenses. Additionally, the initial contracts signed by Plaintiffs with the referring law firms, primarily Danzinger,, did not allow for the deduction of common or general expenses. Moreover, none of the contracts permitted O'Quinn to deduct an arbitrary 3% pro-rata share of the General Expenses from Plaintiffs' settlements. Thus, the Firm, Danziger and the referring attorneys breached its contract with Plaintiffs by charging Plaintiffs for Silica General Expenses when the contracts never permitted the Firm to do so and by charging Plaintiffs an arbitrary 3% pro-rata portion of General Expenses, which was also never agreed to.

57.     Moreover, the Firm, Danziger and other referring attorneys breached its contract with all Plaintiffs by charging unnecessary and/or excessive expenses and charging Plaintiffs individually for expenses relating to *other* Silicosis Clients cases, and/or cases relating to the Texas litigation which should not have been charged to Plaintiffs. These breaches of contract resulted in legal damages to Plaintiffs and/or an improper benefit to the Firm for which Plaintiffs now sue.

## Constructive Fraud

58.     Under Mississippi law, the breach of fiduciary obligations, sometimes characterized as "constructive fraud," has been appropriately recognized as an action in tort, not

contract. A breach of the duty of loyalty is fiduciary in nature and may occur when (1) the attorney obtains an unfair personal advantage, such as acquiring property from a client; or (2) when the attorney or other clients have interests adverse to the client in question. The breach is characterized as "constructive fraud" because proof of intent is irrelevant; thus, the elements of actual fraud, duress, or coercion do not enter into the analysis. "Because a breach of loyalty injures both the client's interests and the legal profession's integrity, the gravity of the harm cannot be cured by good faith." *Tyson v. Moore*, 613 So. 2d 817, 823 (Miss. 1992). Any transaction through which an attorney is deemed to have breached his fiduciary duty and taken undue advantage of his client is voidable and, under proper proof, the court may nullify the transaction, relieve the client of its burdens, and order an equitable remedy of and from the attorney. *Id.* at 28. In such cases, the fee under the contract may be held unenforceable.

59.     In this case, the Firm, Mr. O'Quinn, Laminack, Gibson, Lowenberg and Steed, as well as the referring firms, breached their duties of loyalty as described in the Breach of Fiduciary Duty section above. Therefore, any fee agreement is voidable by Plaintiffs and Plaintiffs seek full fee and expense forfeiture as permitted by law.

### Fraud

60.     The conduct described above constitutes fraud and/or fraud by nondisclosure. The Firm, its lawyers and the referring attorneys had a duty to make full disclosure of all material facts. Nondisclosure of material facts are the equivalent to a false representation since these attorneys had a duty to speak but instead deliberately remained silent. Here, the Firm and the lawyers, including Mr. O'Quinn, Laminack, Gibson, Lowenberg and Steed, as well as the referring attorneys, failed to disclose material information about Plaintiffs' case and/or settlements as described above. These attorneys failed to disclose these material facts

notwithstanding their duty to disclose. Moreover, the Firm and its attorneys affirmatively misrepresented the status of Plaintiffs' claims and settlements as well as various aspects of their litigation including whether or not settlements had been garnered and/or whether or not settlement funds had been received. The Defendants knew that their representations were false while they were making them or were ignorant of their truth and had intent that Plaintiffs rely on their representations or lack of disclosure. Plaintiffs trusted the Firm and these attorneys to keep them informed about their case and relied upon this trust, as well as the affirmative misrepresentations of Defendants to their detriment. As a result, Plaintiffs suffered severe injury.

### Negligent Misrepresentation

61.     Plaintiffs will show that the Firm and its lawyers are liable for damages based on negligent misrepresentation. Specifically, Plaintiffs will show, as described above and in more detail throughout the course of the litigation, that the Firm and these attorneys made representations in the course and scope of their employment and/or the settlement negotiations regarding their silicosis cases either affirmatively or by silence when they had a duty to speak; that the representations supplied false information for the guidance of Plaintiffs in making decisions as to how to proceed with respect to their silicosis case and/or continuing the representation with O'Quinn; that the Firm and these attorneys, in making the representations, did not exercise reasonable care or competence in obtaining or communicating the above described information; and that Plaintiffs relied on the representations to their detriment. This conduct constitutes negligent misrepresentation for which Plaintiffs now sue.

### Negligent Supervision

62.     Mr. O'Quinn was the sole owner of the Firm and was responsible for the supervision of the associates and partners at O'Quinn. As such, Mr. O'Quinn was personally

responsible to see that Plaintiffs' underlying silicosis lawsuits were handled properly by the lawyers at the Firm. Laminack was the managing attorney of the mass tort division of the firm and he too was personally responsible to see that Plaintiffs' underlying silicosis lawsuits were handled properly by the lawyers at the Firm. As described above, the Firm's handling of its silicosis docket was completely and horribly mismanaged. Thus, Mr. O'Quinn, individually, and Laminack, individually are jointly and severally liable for negligent supervision and all damages flowing from such negligence.

**VI.**
**<u>ALTERNATIVE FACTS & ALLEGATIONS</u>**

63.     Plaintiffs believe that they have silicosis or a silica-related injury. However, should any defendant in this case take the position (and should it be proved) that some (or all) Plaintiffs never actually had silicosis; then the Firm, Mr. O'Quinn, Laminack, Gibson, the Firm and its attorneys as well as the referring lawyers are still liable under numerous theories and causes of action which are hereby plead *in the alternative* to the above theories and causes of action.

64.     If any Defendant in this case, including the Firm, takes the position that some or all of the Plaintiffs never had silicosis and were falsely diagnosed with silicosis, the false diagnosis was a product of the Firm's own making and Defendants cannot escape liability. Should any prior diagnosis of Plaintiffs be shown to be false because the necessary procedures or methodology required to make the initial diagnosis were not implemented by the diagnosing doctors, then the Firm, Mr. O'Quinn, Laminack, Gibson and the referring attorneys knew, from the outset, that the Plaintiffs who are proven falsely diagnosed never actually had silicosis. And, from the outset, this should have been disclosed to Plaintiffs rather than intentionally leading them to believe they had a disease that would cause a horrible death. Thus, the Firm, and these

attorneys, at minimum, are liable for knowingly and deceitfully leading Plaintiffs on to believe that they had been diagnosed with a fatal disease all in an effort to create a mass-silicosis docket and generate millions of dollars in fees and expenses and keep themselves, and the experts and screening companies that they retained, gainfully employed for roughly a decade. Such conduct represents a horrible and grave breach of fiduciary duty and O'Quinn and the attorneys should not be permitted to profit off their egregious conduct. *See Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999)(an agent who commits malfeasance should not profit from it).

65.     The Firm, its attorneys and the referring lawyers have affirmatively represented to Plaintiffs that they have silicosis, a disease which could ultimately lead to "progressive pulmonary fibrosis, spontaneous pneumothorax, autoimmune connective tissue diseases such as scleroderma, rheumatoid arthritis, systemic lupus erythematosus and others, tuberculosis, renal complications ... lung cancer" and ultimately death. Many of the Plaintiffs come from lower-class, hardworking backgrounds who have spent their lives as laborers, foundry workers and sandblasters, which required them to work in uncomfortable environments, not in air conditioned luxury office buildings located at the Penthouse of the Lyric Centre. Because of their modest professions, many of these individuals simply cannot afford health insurance and do not possess the means to consult with a regular physician. Thus, they relied on the advice of their lawyers, the Firm, Mr. O'Quinn, Laminack, Gibson, the referring attorneys and the doctors these lawyers employed.

66.     After being diagnosed with silicosis by the doctors selected by O'Quinn and its attorneys, and being told by them, their fiduciaries, that they positively had the incurable disease, Plaintiffs began preparing for the worse. Plaintiffs understandably suffered severe mental anguish and distress. Many became depressed and mentally distraught over the diagnosis. Some

received condolences from family members and others dwelled over what they believed to be the inevitable reality of an ever-impending, horrible decline in health and death. Plaintiffs were simply unable to live their normal lives without the thought of their incurable condition. Thereafter, they became distant from their families and friends. Some even made funeral arrangements and were unable to obtain health and/or life insurance.

67.     Meanwhile, the Firm under the direction of Mr. O'Quinn, Laminack, and Gibson, and at the expense of their clients, continued to "fuel a silicosis litigation machine" by having their medical professionals diagnose as many clients as possible with silicosis. The evidence demonstrates that the Firm funded mass screenings of clients to be carried out by Danziger or others who would work with the screening companies to screen clients, sign them up and then refer them to O'Quinn. Indeed, O'Quinn paid approximately $1.7 million to Danziger for advertising and screening silica cases. With this money, Danziger placed ads in newspapers and sent various letters to solicit cases and paid for "mobile vans" to take X-rays and conduct silicosis and asbestosis screenings in rented spaces at union halls, hotels and community centers. At the screenings, which were advertised as "free", would be attorneys or representatives acting on behalf of O'Quinn or the referring firms. Knowing that the diagnosis would be contrary to medical standards and unreliable, N&M and Dr. Harron had Plaintiffs sign a statement that they could not "sue them for medical malpractice." Although O'Quinn employed Dr. Harron and N&M to conduct the medical screenings, no one from the law firm or any of the referring firms ever advised Plaintiffs not to sign the medical release or otherwise explained to them their rights. Instead, they furthered the scheme to improperly diagnose Plaintiffs with silicosis in order to further their efforts to amass as large of a silicosis docket as possible to extort global settlements from the underlying defendants all to the detriment of the health and well-being of their clients.

68.     On October 11, 2001, the firm "decided to hire Dr. [Ray] Harron to perform the medical examinations for [the firm's] silicosis clients."  Dr. Harron's "point man" was Mr. Mason with N&M.  Even a cursory review of Dr. Harron and N&M's history would have raised a red flag to any perceived legitimacy of their diagnosis. N&M was formed partly by Mr. Mason when he was 21 years old right after he had dropped out of junior college.  Mr. Mason did not have any medical training and N&M has never had a medical director.   In late 1996 or early 1997, N&M hired Dr. Ray Harron, a radiologist and certified B-reader, to read chest x-rays as well as make diagnoses.  N&M paid Dr. Harron $125 per person for the process which included some combination of the following three steps: (1) reading the x-ray, (2) conducting an abbreviated physical exam, and (3) making a diagnosis.

69.     N&M was established initially to meet law firm demand for asbestos cases, but sometime around 2001, law firms like O'Quinn, or its referring firm Danziger, began asking him to screen people for silicosis.  When N&M received responses to its public advertising, N&M then would solicit this client list to law firms, such as Danziger or O'Quinn.  For each of the approximately 2,000 clients represented by O'Quinn in the MDL, N&M was paid $ 335 per positive diagnosis for a chest x-ray and full exam.  But if N&M referred the case, they were paid an additional $350-450 referral fee. Because of this fee structure, Mr. Mason, the owner of N&M, testified that the emphasis was on attracting as many people as possible to the screenings and creating as many positive diagnoses as possible; as he stated, "From a business standpoint of mine, you had to do large numbers."

70.     Even prior to O'Quinn hiring Dr. Harron in 2001, Dr. Harron had given deposition testimony in 1997 admitting to the fact that he sent out blank pre-signed NIOSH B-read forms to law firms.  In further 1997 deposition testimony, when the asbestosis litigation was

prevalent, Dr. Harron testified that 100% of the litigants who he reads as 1/0 or higher, he diagnosis with asbestosis. In 1997, Dr. Harron admitted that, on average, it takes him only a few minutes to interpret or "read" an x-ray. Later, in 2002, Dr. Harron testified that he would interpret between 100 and 150 x-rays in one day and charges $25 per B-read. Such practices were clearly in violation of standard medical procedure. But Dr. Harron's practices were willfully embraced by O'Quinn and the referring attorneys.

71. During the diagnostic process, Defendants themselves were the ones providing Dr. Harron and N&M with the exposure history, thereby not only contributing to any faulty diagnosis, but ensuring it. *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 675-676 (S.D. Tex. 2005) (noting "O'Quinn itself provided the inadequate occupational and exposure histories underlying the purported diagnoses."). And because the practices concerning diagnosing silicosis have remained the same over the last several years, Defendants and the attorneys at the firm, as well as the referring attorneys, had to know of Dr. Harron's unreliable diagnosing methods including his unrealistic diagnosing rate as well as his practice of sending the firm blank B-reader forms as testified to in 1997 deposition testimony. Indeed, the only explanation is that Defendants embraced Dr. Harron and his practices as a cheap and quick way for them to amass their silicosis docket and fuel their "silicosis litigation machine" to generate millions of dollars in attorney's fees. All the while, having their clients, including Plaintiffs, sign statements with N&M prohibiting them suing for medical malpractice.

72. The Firm's obvious disregard for the proper way to diagnose silicosis was evident. The Honorable Judge Janis Graham Jack ("Judge Jack") in her June 30, 2005 Order after conducting numerous hearings on the issue stated:

> [T]he first essential step in diagnosing silicosis involves the taking of a thorough and appropriate occupational and exposure history. Unlike many of the other

> Plaintiffs' firms, O'Quinn did not ask the screening company (here, N&M) to take the histories; *instead, O'Quinn (or a "temp service" hired by O'Quinn) took the occupational and exposure histories.* O'Quinn only used N&M to take x-rays and perform PFTs; O'Quinn took responsibility for the histories and for coordinating the diagnostic process. As detailed above, both Dr. Harron and Dr. Levy relied totally upon the exposure histories provided to them by the lawyers. Dr. Levy was told that a physician had spent 90 minutes with each Plaintiff performing a detailed history and physical. This was shown to be false at the Daubert hearings, and *O'Quinn, at least, should have known it was false from the outset*, since the lawyers or their employees had taken the histories themselves.[3]

Thus, from the outset of the litigation where a client did not actually have silicosis, the Firm, Mr. O'Quinn, Laminack and Gibson knew that the information being provided to their medical professionals to make the necessary silicosis diagnosis was incorrect, thereby rendering any opinions by such professionals erroneous. But this was never disclosed to Plaintiffs.

73.    Instead, the Firm continued to file silicosis claims all in an effort to amass as many clients as possible and generate millions of dollars in fees for the Firm, its attorneys and hundreds of thousands of dollars for their medical professionals all-the-while disregarding the health and welfare of their clients. Recognizing the sad reality that attorneys like O'Quinn placed their interests above those of the clients, the Honorable Ed Whitfield shunned said conduct during a congressional hearing on the issue:

> [T]he type of screening used in this [silicosis] class action lawsuit simply generated claimants to obtain settlements for the benefit of certain plaintiff law firms. Dollars were the priority; patient health and wellbeing were afterthoughts.[4]

Under this scenario, Congressman Whitfield's statement could not be any more accurate.

74.    The reality of Congressman Whitfield's statement is further emphasized by the fact that while they generated millions for O'Quinn and its attorneys, and kept numerous medical professionals gainfully employed, the settlements hardly benefited the Silicosis Clients. When

---

[3] *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 675 (S.D. Tex. 2005)(emphasis added)(citations omitted).
[4] *See* STAFF OF H. COMM. ON ENERGY & COMMERCE, MEMORANDUM TO THE SUBCOMM. ON OVERSIGHT AND INVESTIGATIONS: 109TH CONG., OVERSIGHT AND INVESTIGATIONS HEARINGS: —THE SILICOSIS STORY: MASS TORT SCREENING AND THE PUBLIC HEALTH: FIRST DAY OF HEARINGS (Comm. Print March 8, 2006) at 2.

Plaintiffs actually received settlements they were depleted by fees and unwarranted expenses. In fact, there were several instances where the Plaintiffs were forced to approve settlements where the Firm would recover expenses and fees, but the clients would receive nothing. The Firm, Laminack, and Gibson represented to the Plaintiffs that these settlements, where they would receive zero, were the best way to resolve their claims. In reality, it was the best way for the Firm to obtain fees and the return of their lavish arbitrary and unwarranted expenses.

75.    In the end, the Firm, Mr. O'Quinn, Laminack, and Gibson, and later Steed and Lowenberg, as well as the referring attorneys, were able to generate approximately $30 million in attorneys' fees and hundreds of thousands of dollars for the medical professionals and screening companies that they employed. They did this by placing their interests above those of their clients and by lying to their clients, the judicial system, Congress and the Silicosis Defendants; convincing them all that Plaintiffs had silicosis. Millions of dollars were the priority; Plaintiffs' health and wellbeing were afterthoughts indeed.

## VII
## ALTERNATIVE CAUSES OF ACTION

76.    Based on the above alternative scenario, it has become necessary to bring this suit to collect a legal debt of money damages owing to Plaintiffs due to the Firm and its attorneys' conduct as well as the conduct of the referring lawyers. The actions, as described in Section VI constitute breach of fiduciary duty, constructive fraud, fraud, negligent misrepresentation, and negligent or intentional infliction of emotional distress.

### Breach of Fiduciary Duty

77.    An attorney client relationship existed between Plaintiffs and Defendants. Thus, the Firm and its attorneys and the referring lawyers owed Plaintiffs various fiduciary duties as a matter of law relating to the standard of conduct, including: (1) Duty to act with loyalty and

utmost good faith and fair dealing; (2) Duty to act with absolute perfect candor, openness, and honesty, without any deception or concealment, no matter how slight; (3) Duty to be strictly honest about fee agreements and to refrain from self-dealing; (4) Duty to inform Plaintiffs of matters material to the representation; and (5) Duty to place the Plaintiffs' interests ahead of Defendants interests.

78.     The Firm and its lawyers, as well as the referring attorneys, breached the foregoing fiduciary duties as set out above in Section VI. Specifically, the Firm and these lawyers placed their own interests above those of Plaintiffs and grossly misrepresented the health and welfare of Plaintiffs for the purpose of profiting off their potential disease.

79.     The Firm and these attorneys, as well as the referring lawyers, further intentionally breached the foregoing duties by, among other things, (1) conspiring with medical professionals, such as N&M, Dr. Harron, Dr. Levy, and others, to screen clients, knowing that such screenings may be performed improperly and/or against proper medical procedures, in order to amass as large of a client list as possible to extort "global settlements" from the Silicosis Defendants; and (2) intentionally concealing from Plaintiffs that they did not actually have silicosis, and leading Plaintiffs on to believe that they did in fact have the disease, when these defendants knew, as early as 2001, that their medical professionals relied totally upon the inadequate exposure histories provided to them by the Firm and therefore these physicians reports would be rendered suspect. As a direct result of the aforementioned breaches, Plaintiffs suffered injuries, both financially and mentally, in that they lived their lives believing they had been diagnosed with the incurable disease of silicosis while Mr. O'Quinn, the Firm and its attorneys and the referring lawyers reaped the profits of any false diagnosis, which was a product of their own making.

## Constructive Fraud

80.     Under Mississippi law, the breach of fiduciary obligations, sometimes characterized as "constructive fraud," has been appropriately recognized as an action in tort, not contract. Constructive fraud occurs when the attorney breaches the duty of loyalty to a client and is fiduciary in nature.  In this case, the Firm, Mr. O'Quinn, Laminack, Gibson, Lowenberg and Steed, as well as the referring firms, breached their duties of loyalty as described in the Breach of Fiduciary Duty section above. Any transaction through which an attorney is deemed to have breached his fiduciary duty and taken undue advantage of his client is voidable and, under proper proof, the court may nullify the transaction, relieve the client of its burdens, and order an equitable remedy of and from the attorney. In such cases, the fee under the contract may be held unenforceable. Therefore, the fee agreement is voidable by Plaintiffs and Plaintiffs seek full fee and expense forfeiture as permitted by law.

## Fraud and Fraud by Non-Disclosure

81.     Plaintiffs will show that the Firm and its attorneys' conduct, as well as the conduct of the referring firms, as described in Section VI constitutes fraud and/or fraud by non-disclosure. These attorneys, due to their fiduciary relationship with Plaintiffs, had a duty to make full disclosure of all material facts. Nondisclosure of material facts are the equivalent to a false representation since these attorneys had a duty to speak but instead deliberately remained silent. Moreover, a person making a representation to another has a duty to make a full representation with hiding material facts regarding the representation.  Additionally, if the representation is later found to be false, the person making the representation has a duty to inform the recipient of the falsity. Here, Mr. O'Quinn, Laminack, Gibson and later Steed, Lowenberg and the referring attorneys not only failed to disclose to Plaintiffs that they did *not* have silicosis (if in fact they

didn't), but they, and the medical professionals they employed, conspired and affirmatively represented to Plaintiffs that they had been diagnosed with the life-threatening and crippling disease. Such non-disclosure and/or intentional or reckless misrepresentations were made in an effort to "fuel a silicosis litigation machine" and generate tens of millions of dollars in attorneys' fees and expenses for the attorneys and the medical professionals they hired and prevent Plaintiffs from ceasing the representation. As a result, Plaintiffs suffered injury, both financially and mentally, in that they lived their lives believing they had been diagnosed with the incurable and crippling disease of silicosis while the Firm and these attorneys reaped the profits to the tune of at least $30 million dollars.

## Negligent Misrepresentation

82.     Plaintiffs will show that Firm and its attorneys as well as the referring lawyers are liable for damages based on negligent misrepresentation.  Specifically, Plaintiffs will show, as described above and in more detail throughout the course of the litigation, that these attorneys, either personally or through the medical professionals that they employed, made representations in the course of their employment regarding Plaintiffs medical condition. Specifically, these attorneys represented to Plaintiffs that they had been diagnosed with the life-threatening disease of silicosis. Such representations supplied false information for the guidance of Plaintiffs in making his decisions as to how to proceed with respect to their silicosis case and/or continuing the representation with the Firm and its attorneys.  Plaintiffs will further show that these attorneys, in making the representations, did not exercise reasonable care or competence in obtaining or communicating the above described information for which Plaintiffs relied upon to their detriment.

### Negligent or Intentional Infliction of Emotional Distress

83.    Plaintiffs will further show that the Firm and its attorneys, as well as the referring attorneys, are liable under a theory of negligent or intentional infliction of emotional distress. These attorneys acted negligently, intentionally or recklessly when they had their medical professionals falsely diagnose Plaintiffs with silicosis (if in fact they did not have silicosis) in order to amass as large of a client list as possible to extort "global settlements" from the Silicosis Defendants. These attorneys knew, or had reason to know, that such acts and conduct would create a high degree of risk of harm to Plaintiffs in that they would reasonably believe that they had been diagnosed with a life threatening and crippling disease and have as little as two years to live. The emotional distress suffered by each Plaintiff was severe as Plaintiffs experienced fright, horror, mental breakdowns, worry, stress and other emotional distress that no reasonable person could expect to endure without undergoing unreasonable suffering. Many Plaintiffs so strongly believed that they were going to die that they began making funeral arrangements.

84.    The Defendants' conduct, as described in Section VI, was extreme and outrageous and shocks the conscious of a civilized community or evokes outrage or revulsion. This is particularly true given the fact that the relationship between Plaintiffs and their attorneys was one of a fiduciary nature. As such, the Firm and its attorneys abused the trust, faithfulness, and candor of their position. Finally, Defendants' conduct and infliction of emotional distress was the proximate cause of Plaintiffs' damages.

### Civil Conspiracy

85.    Under Mississippi law, "[a] conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Levens v. Campbell*, 733 So. 2d 753, 761 (Miss. 1999). Where a civil conspiracy gives rise to damages, a

right of recovery may arise. *Roussel v. Hutton*, 638 So. 2d 1305, 1315 (Miss. 1994). Plaintiffs will show that the Firm, Mr. O'Quinn, Laminack, Gibson and later Steed and Lowenberg, as well as the referring lawyers, conspired to commit the acts as outlined above in Section VI against Plaintiffs. Alternatively, Plaintiffs will further show that the Firm and these attorneys and the referring lawyers and the doctors and medical professionals involved conspired to commit the acts as outlined above in Section VII against Plaintiffs. The conspiracy caused Plaintiffs the damages alleged herein. In this regard, the Firm and the referring attorneys, including Danziger, were involved in a conspiracy to have O'Quinn breach its fiduciary duties to Plaintiffs by falsely diagnosing them with silicosis. Moreover, based on information and belief, the Firm and its attorneys willfully suppressed the truth as to the activity or inactivity taking place on Plaintiffs' silicosis lawsuits. The co-conspirators include various attorneys at the Firm, the referring attorneys, and other individuals or entities including the medical and other professionals that they hired including the screening companies. The Firm and its attorneys, in addition to other individuals and entities either: (1) actively took part in the suppression, concealment and misrepresentation of the activity or inactivity of Plaintiffs' silicosis lawsuit; (2) furthered the plan or plans by cooperation and request; (3) aided or encouraged the actual wrongdoers; or (4) ratified and adopted the wrongdoer's acts for their benefit.

### Vicarious Liability

86.    The O'Quinn Law Firm and/or John M. O'Quinn & Associates in addition to all other entities John M. O'Quinn operated under is liable under the doctrine of *respondeat superior* for the acts of any of its attorneys, including, but not limited to Mr. O'Quinn, Laminack, Gibson, Steed and Lowenberg who at all times relevant hereto were acting in the course and scope of the employment with the Firm.

87.     Moreover, the referring attorneys including Danzinger are vicariously liable for the conduct of the Firm or its attorneys. Under Mississippi law, if the division of responsibility is not clearly spelled out, the client's consent to the association does not prevent vicarious liability between or among counsel when the attorneys share the representation and legal fees. *Duggins v. Guardianship of Washington*, 632 So. 2d 420, 426 (Miss. 1993). Furthermore, all Defendants are liable for all those who acted within the course and scope of actual or apparent authority, including liability for fraudulent wrongs. *Id.* at 429.

### Alter Ego

88.     All of the entities that John M. O'Quinn practiced law under were in fact the alter ego of John M. O'Quinn individually.   John M. O'Quinn was the sole equity owner in each of the entities he practiced law under and was solely responsible for the ultimate management decisions regarding every aspect of the firms' silicosis docket.   Therefore, all liability for the actions of the lawyers at the various firms ultimately fall at the feet of John M. O'Quinn.

### Discovery Rule and Fraudulent Concealment

89.     Plaintiffs affirmatively plead the discovery rule and/or fraudulent concealment to any defense of limitations asserted by any Defendant to any of Plaintiffs' causes of action in this litigation. The discovery rule applies when it would be impractical to require a layperson to have discovered the malpractice at the time it happened. *Smith v. Sneed*, 638 So. 2d 1252, 1257-1258 (Miss. 1994)). This is because requiring a layperson to ascertain legal malpractice at the time it occurs would necessitate the retention of a second attorney to review the work of the first. *Id.* Indeed, "attorneys cannot rely on their failure to fully inform their clients to assert the statute of limitations in a legal-malpractice action." *Bennett v. Hill-Boren P.C.*, 52 So. 3d 364, 372 (Miss. 2011). Furthermore, fraudulent concealment as a defense to limitations can be shown by (1) a

subsequent affirmative act of concealment, and (2) due diligence. *Id.* The fiduciary relationship that exists between attorney and client creates a duty of disclosure. *Id.* When a fiduciary relationship exists, the failure to disclose can be an affirmative act. *Id.* And when an attorney fails to take any measures to inform their clients of any failures or issues with their representation, there may be fraudulent concealment as a matter of law. *Id.* at 372-373.

90.     Here, Defendants never disclosed to Plaintiffs any of the issues, problems, concerns or conduct outlined in this Complaint despite many Plaintiffs' inquiries into the status of their case. Indeed, any request for information made by Plaintiffs would usually be ignored or scant information would be provided. Further, any letters that were sent to Plaintiffs concerning their litigation were typically, and intentionally, drafted in convoluted legalese that not even attorneys at the O'Quinn Law Firm could understand. Thus, it would be impractical to require a Plaintiffs, laypersons, to have discovered the malpractice and various other conduct outlined above at the time it happened. This is especially true in light of Defendants affirmative efforts to conceal the information and subsequent efforts to destroy the client files.

### Accounting

91.     Plaintiffs further request an accounting for a number of expenses that were assessed and charged against them by the Firm which are believed to be excessive in nature and/or improper. Such overcharging and assessments would amount to additional breaches of fiduciary duty and support Plaintiffs' fraud and breach of contract claims which can only be determined by a true and accurate accounting. Plaintiffs further request an accounting of all attorneys' fees generated by the Firm's silicosis docket and all settlement funds disbursed to Plaintiffs.

### Actual Damages

92.     Regarding the causes of action and conduct alleged above, each Plaintiff has sustained pecuniary losses that were proximately caused by the Firm and its lawyers' conduct. Plaintiffs hereby seek the maximum allowable amount of actual damages that exceed the jurisdictional limits of this court.

### Punitive Damages

93.     Based upon the Firm, its attorneys' and referral lawyers' intentional breaches of fiduciary duty, gross negligence, fraud and intentional infliction of emotional distress, Plaintiffs are entitled to exemplary/punitive damages.

### Attorneys' Fees

94.     As a result of the Firm, its attorneys and the referral lawyers' liability for punitive damages, Plaintiffs are entitled to reasonable attorneys' fees necessary to prosecute this action. The law recognizes that contingency fees can be reasonable and necessary under the circumstances. Under these circumstances, a reasonable attorneys' fee of 40% of the entire recovery should be assessed against Defendants.

### Mental Anguish

95.     Plaintiffs are entitled to mental anguish damages under their alternative theory of negligent or intentional infliction of emotional distress claim. Accordingly, Plaintiffs hereby seek mental anguish damages herein.

### Fee and Expense Forfeiture

96.     Due to the Firm, its attorneys or the referral lawyers' blatant and intentional breach of fiduciary duty and various breaches of their duty of loyalty, Plaintiffs are entitled to

void the contract and disgorge the fees and/or expenses paid to these Defendants. Thus, Plaintiffs seek total fee forfeiture due to the egregious conduct outlined above.

**<u>PRAYER</u>**

WHEREFORE, Plaintiffs pray that after trial herein, that judgment be entered against all Defendants jointly and severally as prayed for, that Plaintiffs have prejudgment as well as post-judgment interest, and for such other and further relief, at law to which Plaintiffs may show themselves to be justly entitled, and to which the Court believes Plaintiffs to be deserving, and with all costs of court herein accruing to be assessed against Defendants.

Dated: March 10, 2016.

Nancy Powers Johnson
 (MS Bar #103893)
ATTORNEY AT LAW
420 Crockett Ave.
Greenwood, MS 38930
(662) 515-4920
FAX (662) 453-6783
Njohnson@rcconst.net