IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

RANDY L. ADAMS; DAVID J. AMONS;
FREDDIE BOLTON, JR.; WILEY BROOKS;
JR., Individually and as Representative of
Estate of Wiley Brooks; ESTATE OF
WILEY BROOKS; CLARENCE EDWARD
BRYANT, SR.; JESSIE L. CARTER, JR.;
SHURMON CHAFFEE; ZADIE DYKES,
Individually and as Representative of the
Estate of Billy E. Dykes; ESTATE OF BILLY
E. DYKES; CHARLIE HARRIS, JR.; WALTER
L. McCOY; PENELOPE McCOY, Individually
and as Representative of the Estate of Willie J.
McCoy; ESTATE OF WILLIE J. McCOY;
ANNIE PEARL NEVELS, Individually and
as Representative of the Estate of Louis Nevels;
ESTATE OF LOUIS NEVELS; SELMOND
NORALS; RANDOLPH PERRYMAN;
JEAN Y. PEYREGNE; JOHN ALEXANDER
PRINE; LARRY NOBLE SEWELL, SR.;
LUTHER THREET; and BERDELL WILLIS                    PLAINTIFFS

v.                                  CIVIL ACTION NO. 4:16-cv-00071-GHD-JMV

JOHN M. O'QUINN & ASSOCIATES, PLLC
d/b/a The O'Quinn Law Firm; JOHN M.
O'QUINN & ASSOCIATES, L.L.P.; JOHN
M. O'QUINN, P.C.; JOHN M. O'QUINN
LAW FIRM, PLLC; T. GERALD TREECE,
Independent Executor of the Estate of John
M. O'Quinn, Deceased; RICHARD N.
LAMINACK; JOE GIBSON, DANZIGER
& DE LLANO, LLP; and ABEL MANJI                      DEFENDANTS

## MEMORANDUM OPINION

Presently before the Court are several motions. On June 23, 2016, Defendant Richard M.

Laminack ("Laminack") filed a motion to dismiss [26] for lack of personal jurisdiction. On June

24, 2016, Defendants John M. O'Quinn & Associates PLLC d/b/a The O'Quinn Law Firm, John

M. O'Quinn & Associates, L.L.P., John M. O'Quinn, P.C., and John M. O'Quinn Law Firm

PLLC (collectively, the "O'Quinn Firms"), as well as T. Gerald Treece, Independent Executor of the Estate of John M. O'Quinn, Deceased ("Treece"), filed a motion to dismiss the action or, in the alternative, to compel arbitration and stay the case [28], as well as a motion for a more definite statement and to dismiss fraud-based claims [30]. On June 27, 2016, Defendant Danziger & De Llano, LLP ("Danziger") filed a motion to dismiss for failure to state a claim or for a more definite statement [34]. These motions are fully briefed and ripe.[1] Finally, on July 12, 2016, Defendant Abel Manji ("Manji") filed a motion to retain Plaintiffs' claims against him with the claims against the O'Quinn Firms [54]; Plaintiffs have not filed a response to that motion, and the time for doing so has now passed. Thus, that motion is ripe, as well. Upon due consideration of all the foregoing, the Court finds that the motion to dismiss [26] for lack of personal jurisdiction must be denied; the motion to dismiss the action or, in the alternative, to compel arbitration and stay the case [28] must be granted in part and denied in part, specifically, the request to compel arbitration and stay the case must be granted, but the request to dismiss the case must be denied; the motion for a more definite statement and to dismiss fraud-based claims [30] must be denied as moot; and the motion to retain claims against Manji with the claims against the O'Quinn Firms [54] must be granted.[2]

## I. *Factual and Procedural Background*

On March 14, 2016, Plaintiffs, as listed in the case caption above, filed this legal malpractice suit against the O'Quinn Firms and "related entities and persons." Pls.' State-Ct. Compl. [2] ¶ 13. On April 13, 2016, the Defendants timely removed the case to this Court on the basis of diversity of citizenship. Plaintiffs are citizens of Mississippi or Alabama; Defendants

---

[1] In addition, after seeking and being granted leave to do so, the O'Quinn Firms and Treece filed in support of their arbitration motion [28] the following: a supplement [62] and a notice of orders [63] in seven related cases in other Mississippi venues filed by other plaintiffs against the O'Quinn Firms and other defendants.

[2] Danziger's motion to dismiss for failure to state a claim or for a more definite statement [34] shall be ruled on at a later date.

are citizens of Texas. The amount in controversy well exceeds the jurisdictional threshold, as it is undisputed that Plaintiffs seek actual, exemplary, and mental anguish damages in an amount greater than $75,000 exclusive of interest and costs. Thus, the Court may exercise subject-matter jurisdiction in this case pursuant to 28 U.S.C. § 1332.

Plaintiffs assert they were exposed to silica dust during their employment in various crafts, such as sandblasting. Due to this exposure, Plaintiffs maintain they were solicited by Defendants as mass tort plaintiffs in silica litigation in the early 2000s when out-of-state law firms came into Mississippi and flooded Mississippi state courts with multiple-plaintiff suits. Plaintiffs allege, *inter alia*, that Defendants "led clients, the judicial system, defendants in the underlying case, and opposing counsel to believe that its clients had silicosis in order to generate millions of dollars in attorneys' fees and expenses." *Id.* ¶ 14. According to Plaintiffs, silicosis is a disease caused by the inhalation of silica dust.

Plaintiffs allege that the O'Quinn Firms represented approximately 3,000 clients, who were occupationally exposed to silica-containing products and materials, and that law firms, including Danziger, solicited these Plaintiffs to enter into contracts and promised to litigate their silicosis claims against the silicosis defendants, but subsequently referred the silicosis claims to the O'Quinn Firms. It is undisputed that each named Plaintiff in the case *sub judice* hired the O'Quinn Firms to represent them in silica-related claims. *Id.* ¶ 15. It is further undisputed that Plaintiffs signed contracts with the O'Quinn Firms that "hired [the O'Quinn Firms] on a contingency fee basis and issued the [O'Quinn Firms] a Power of Attorney . . . to represent them in any and all claims against the [s]ilicosis [d]efendants" ("Agreements"). *Id.* ¶ 17; *see generally*

3

Agreements [28-1].[3]

According to Plaintiffs, Defendants improperly billed the amounts they paid to companies for medical screening and/or referrals as expenses in their individual cases. Plaintiffs further assert that although the O'Quinn Firms reached global settlements with several of the silica manufacturers/distributors that were sued, the O'Quinn Firms failed to distribute the settlement proceeds in a timely manner and wrongfully retained portions of those proceeds for their own use. Plaintiffs aver that they were required to pay the O'Quinn Firms a percentage of their settlement proceeds to cover so-called general expenses of the O'Quinn Firms, including referral fees to other law firms and medical screening companies; office overhead and supplies; and costs associated with excessive travel, lodging, and dining. Finally, Plaintiffs allege that Defendants made multiple errors in processing settlements, including delays and lack of communication, and ultimately failed to fully investigate and assess Plaintiffs' individual claims, including ensuring that settlements were paid in accordance with the severity of Plaintiffs' medical conditions, entering into aggregate or global settlements with silica manufacturers and/or distributors and then intimidating and coercing Plaintiffs into accepting those settlements regardless of the nature and extent of their individual silica-related injuries, permitting the wrongful dismissal of claims against several silica manufacturers and/or distributors, failing to provide necessary paperwork to the courts, failing to process and/or finalize settlement agreements, and attempting to conceal wrongful behavior by sending Plaintiffs deceptive disclosure letters and by destroying and/or altering documents in their files. Plaintiffs assert claims for legal malpractice/negligence, gross negligence, breach of fiduciary duty, breach of contract, constructive fraud, fraud, negligent misrepresentation, and negligent supervision.

---

[3] Plaintiffs Jessie L. Carter, Jr., Charlie Harris, Jr., Selmond Norals, Randolph Perryman, Jean Y. Peyregne, John Alexander Prine, and Larry Noble Sewell, Sr. entered into powers of attorney and contingent fee contracts with both John M. O'Quinn & Associates, L.L.P. and Stacie F. Taylor, LLC. *See* Agreements [28-1].

4

## II. *Analysis and Discussion*

As stated above, several motions are pending before the Court. The Court addresses the motions as follows.

### A. Laminack's Motion to Dismiss for Lack of Personal Jurisdiction

First, the Court addresses Laminack's motion to dismiss [26] for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

Although Plaintiffs bear the burden of proof in this determination, they need only present *prima facie* evidence of personal jurisdiction. *See Patterson v. Aker Sols. Inc.*, 826 F.3d 231, 233 (5th Cir. 2016) (citing *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002)). The Court " 'must accept [Plaintiffs'] uncontroverted allegations, and resolve in [their] favor all conflicts between the facts contained in the parties' affidavits and other documentation.' " *Id.* (quoting *Revell*, 317 F.3d at 469). " 'The district court is not obligated to consult only the assertions in [Plaintiffs'] complaint in determining whether a *prima facie* case for jurisdiction has been made. Rather, the district court may consider the contents of the record at the time of the motion . . . .' " *See Hazim v. Schiel & Denver Book Publishers*, 647 F. App'x 455, 457–58 (5th Cir. 2016) (per curiam) (quoting *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006)).

In a personal jurisdiction determination, the Court first turns to Rule 4(k)(1)(A), which provides that a court has personal jurisdiction over any defendant who would be subject to personal jurisdiction under the long-arm statute of the state in which the Court sits. Thus, in this diversity action, the Court must conduct a two-prong analysis: first, examine whether Laminack is amenable to suit under the Mississippi long-arm statute, Mississippi Code § 13-3-57; and

second, determine whether the exercise of personal jurisdiction over Laminack would comport with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[4]

The Mississippi long-arm statute provides that a court has personal jurisdiction over

> [a]ny nonresident . . . who shall [1] make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall [2] commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall [3] do any business or perform any character of work or service in this state.

MISS. CODE ANN. § 13-3-57. The three prongs of the statute are commonly referred to as the "contract prong," the "tort prong," and the "doing-business prong."

For the court to have personal jurisdiction over a nonresident defendant pursuant to the doing-business prong, "(1) the non-resident . . . must purposefully do some act or consummate a transaction in Mississippi; (2) the cause of action must either arise from or be connected with the act or transaction; and (3) the assumption of jurisdiction by Mississippi must not offend traditional notions of fair play and substantial justice." *Internet Doorway, Inc. v. Parks*, 138 F. Supp. 2d 773, 775 (S.D. Miss. 2001) (citing *Gross v. Chevrolet Country, Inc.*, 655 So. 2d 873, 877 (Miss. 1995) (citing *Rittenhouse v. Mabry*, 832 F.2d 1380, 1384 (5th Cir. 1987)). The Mississippi Supreme Court has stated that "the long-arm statute, by its plain terms, applies to any person or corporation performing any character of work in this state." *Estate of Jones v. Phillips ex rel. Phillips*, 992 So. 2d 1131, 1139 (Miss. 2008); *see also ITL Int'l, Inc. v. Constenla, S.A.*, No. 10–60892, 2012 WL 266987, at *2 (5th Cir. Jan. 31, 2012). A nonresident defendant is subject to personal jurisdiction in Mississippi under the contract prong of the Mississippi long-

---

[4] The two-prong analysis is necessary, because the Mississippi long-arm statute is not coextensive with due process. *See Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 n.7 (5th Cir. 2000); *Tichenor v. Roman Catholic Church*, 32 F.3d 953, 958 (5th Cir. 1994); *Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 882 n.5 (5th Cir. 1993).

arm statute if the defendant entered into a contract with a Mississippi resident that is to be at least partially performed in Mississippi. MISS. CODE ANN. § 13-3-57.

If the Court is satisfied that the long-arm requirements are satisfied, the Court must determine whether personal jurisdiction over Laminack would comport with the Due Process Clause of the Fourteenth Amendment. An individual should not be subject to the binding judgment of a forum for which he has established no meaningful "contacts, ties, or relations." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S. Ct. 154, 90 L. Ed. 95 (1945). Jurisdiction may be general or specific. For the forum to have general jurisdiction over the defendant, the defendant's contacts with the forum state must be systematic and continuous, and that activity must give rise to the episode-in-suit. *Id.* at 317, 66 S. Ct. 154; *Jackson v. FIE Corp.*, 302 F.3d 515, 530–31 (5th Cir. 2002). When the plaintiff alleges that specific jurisdiction is proper, as Plaintiffs do in this case, the Court must determine whether the due process requirements are satisfied: (1) the defendant must have minimum contacts purposefully directed at the forum state; (2) a nexus must exist between the defendant's contacts and the plaintiff's claims; and (3) the exercise of jurisdiction over the defendant must be fair and reasonable. *See McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009); *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002). The defendant must have sufficient contacts with the forum state such that it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). The defendant must have "purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there," and such contacts must be more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Burger*

*King,* 471 U.S. at 475, 105 S. Ct. 2174 (internal quotation marks and citations omitted). Isolated or sporadic contacts are sufficient for specific jurisdiction, provided the claim arises out of or relates to these contacts. *See id.* at 475 n.18, 105 S. Ct. 2174; *Luv N' Care, Ltd. v. Insta-Mix, Inc.,* 438 F.3d 465, 469 (5th Cir. 2006); *Nuovo Pignone,* 310 F.3d at 379.

In his challenge to personal jurisdiction, Laminack, a Texas resident and citizen, argues that he does not have sufficient contacts with the State of Mississippi to permit the exercise of either general or specific *in personam* jurisdiction over him in this forum. Laminack argues that none of Plaintiffs' allegations against him support personal jurisdiction, because the actions were not taken in his individual or personal capacity, but were instead taken in his capacity as an employee or agent of the O'Quinn Firms. Laminack maintains that he signed the contracts with Plaintiffs on behalf of the O'Quinn Firms as their representative, but that he was not a party to the contracts with Plaintiffs; that he did not enter any contract with referral lawyers in his personal capacity or any contract with an expert or consultant in his personal capacity, signing such agreements on behalf of the O'Quinn Firms; that he did not negotiate, or fail to negotiate, settlements in his personal capacity and that his involvement in the settlements was in the course and scope of his employment with the O'Quinn Firms; and that the fiduciary shield doctrine protects him as an individual transacting business within the State of Mississippi solely as a corporate officer or employee, because Plaintiffs fail to allege or present evidence that Laminack personally benefited through any alleged abuse of the corporate privilege with the O'Quinn Firms. Laminack argues that he does not meet the doing-business prong of the long-arm statute.

Plaintiffs cite numerous actions taken by Laminack in the silica litigation that allegedly support the exercise of personal jurisdiction by the Court. Among many other allegations of wrongdoing directed at Mississippi, Plaintiffs allege that Laminack, as a principal attorney of the

O'Quinn Firms and managing partner of the firm's mass tort division, Pls.' State-Ct. Compl. [2] ¶¶ 14, 24, 62, "wrongfully retained . . . settlement proceeds [in the silicosis litigation with Plaintiffs] for [his] own use," *id.* ¶ 26, and "made misrepresentations [by phone to Plaintiffs] concerning [their] settlements rather than tell[ing] [Plaintiffs] the truth and issu[ing] a disbursement," *id.* ¶ 27. Plaintiffs further allege that under Laminack's direction, the O'Quinn Firms "held Plaintiffs' funds hostage in order to pay future expenses and interest to the benefit of the [O'Quinn Firms] and to the detriments of Plaintiffs," *id.*, and under Laminack's management, "permitted numerous charges to be billed to Silicosis General for work done in one group of state's cases that had nothing to do with the other state court litigation," thus charging Plaintiffs "expenses for their cases that were never actually incurred for their cases," *id.* ¶ 30. Plaintiffs aver that Laminack led and managed the O'Quinn Firms to "squander[ ] hundreds of thousands of dollars through frivolous conduct . . . bill[ing] its overhead as 'expenses' to [Plaintiffs]" and "unreasonably increase[] the expenses in the silicosis cases through carelessness and disregard." *Id.* ¶¶ 31–32. Plaintiffs further aver that at Laminack's hands the O'Quinn Firms "committed numerous errors while processing a number of the settlements with the [s]ilicosis [d]efendants" and were involved in the wrongful dismissal of many cases. *Id.* ¶¶ 33–38. Plaintiffs allege that Laminack is individually liable, as well as liable on behalf of the O'Quinn Firms.

Furthermore, in Plaintiffs' response to the personal jurisdiction motion, they attach evidence supporting that Laminack was the former managing attorney of the O'Quinn Firms' mass tort docket, personally represented Plaintiffs in their underlying silica claims that were filed in Mississippi, was listed as Plaintiffs' attorney on an internal settlement memorandum, entered into contracts with Plaintiffs and Mississippi-associating counsel and experts, signed pleadings filed in Mississippi, sent thousands of letters to Plaintiffs concerning the underlying silica

litigation with erroneous and fraudulent advice made the subject of the case *sub judice*, and took private jets to Mississippi for work done on the silica litigation and inappropriately had these expenses billed to Plaintiffs' case as expenses.

Although Laminack claims the fiduciary shield doctrine applies and would render the exercise of personal jurisdiction over him improper, this Court finds that the allegations and evidentiary submissions Plaintiff has presented to the Court make a *prima facie* showing that Laminack had purposeful contacts with Mississippi and that the exercise of personal jurisdiction over Laminack would comport with the Due Process Clause of the Fourteenth Amendment.

"[T]he fiduciary-shield doctrine . . . holds that an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has *in personam* jurisdiction over the corporation." *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985); *see Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 794 (5th Cir. 2007) (per curiam) (citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437–38 (Tex. 1982)). Although the fiduciary shield doctrine could "prohibit this [C]ourt from ascribing acts of [the O'Quinn Firms] to [Laminack], it does not prohibit [Laminack] from being held personally liable for his own tortious conduct simply because he [was an attorney in the O'Quinn Firms]." *See Gen. Retail Servs., Inc.*, 255 F. App'x at 795. A defendant's status as an employee "does not somehow insulate [him] from jurisdiction"; instead, his "contacts with the forum State must be assessed individually." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 276 (5th Cir. 2006) (quoting *Calder v. Jones*, 465 U.S. 783, 790, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984) (internal quotation marks omitted)). In assessing Laminack's contacts with the State of Mississippi, the Court finds that Plaintiffs' allegations and evidence support that Laminack directed numerous employment-related activities

at Mississippi and is an alleged primary participant in wrongdoing intentionally directed at Plaintiffs, many of whom are Mississippi residents. *See Calder*, 465 U.S. at 790, 104 S. Ct. 1482. Plaintiffs' claims provide that Laminack engaged in attorney-client relations with them, including appearing as counsel of record on pleadings filed in Mississippi and negotiating settlements with Mississippi companies for Mississippi clients. Laminack's Mississippi-directed employment activities form the basis of Plaintiffs' claims in this case and were allegedly intended to cause economic injury to Plaintiffs. For all of the foregoing reasons, the exercise of *in personam* jurisdiction over Laminack is proper.

Therefore, Laminack's motion to dismiss for lack of personal jurisdiction [26] shall be denied, and Plaintiffs' request to take discovery related to the personal jurisdiction issue shall be denied as moot.

### B. O'Quinn Firms' and Treece's Motion to Compel Arbitration

Second, the Court addresses the motion to compel arbitration [28] filed by the O'Quinn Firms and Treece, who move the Court to compel arbitration under 9 U.S.C. § 3 of the Federal Arbitration Act (the "FAA"), which provides in pertinent part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . the court . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

*See* 9 U.S.C. § 3.

### i.     Background of the Law on Arbitration

In 1925, Congress enacted the FAA in response to the longstanding, widespread judicial hostility to arbitration agreements that existed at English common law and was adopted by American courts. *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct.

1647, 114 L. Ed. 2d 26 (1991); *Am. Bankers Ins. Co. of Fla. v. Inman*, 436 F.3d 490, 492–93 (5th Cir. 2006).[5] "The FAA provides that a 'written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' " *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 532, 132 S. Ct. 1201, 182 L. Ed. 2d 42 (2012) (quoting 9 U.S.C. § 2). It "requires courts to enforce the bargain of the parties to arbitrate," *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985), and "reflects an emphatic federal policy in favor of arbitral dispute resolution," *KPMG LLP v. Cocchi*, 565 U.S. ——, ——, 132 S. Ct. 23, 25, 181 L. Ed. 2d 323 (2011) (per curiam) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985) (internal quotation marks omitted)). The FAA

> does not mandate the arbitration of all claims, but merely the enforcement—upon the motion of one of the parties—of privately negotiated arbitration agreements. The House Report accompanying the [FAA] makes clear that its purpose was to place an arbitration agreement "upon the same footing as other contracts, where it belongs," H.R. REP. NO. 96, 68th Cong., 1st Sess., 1 (1924), and to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate.

*Dean Witter Reynolds, Inc.*, 470 U.S. at 219–20, 105 S. Ct. 1238. Because "arbitration is a matter of contract," courts must "rigorously enforce arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, —— U.S. ——, ——, 133 S. Ct. 2304, 2309, 186 L. Ed. 2d 417 (2013). Thus, arbitration may be compelled only if the parties agreed to arbitrate the dispute in question. *See* 9 U.S.C. § 4; *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63,

---

[5] In 1947, Congress reenacted and codified the FAA as Title 9 of the United States Code.

67–68, 130 S. Ct. 2772, 177 L. Ed. 2d 403 (2010); *Janvey v. Alguire*, 847 F.3d 231, 240 (5th Cir. 2017) (per curiam).

Against this backdrop, the Court generally assesses whether the parties agreed to arbitrate the dispute in question using a two-step process: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *See Gross v. GGNSC Southaven, L.L.C.*, 817 F.3d 169, 176 (5th Cir. 2016). If the Court finds that the parties have a valid agreement to arbitrate and that the dispute is within the scope of the arbitration agreement, the Court generally examines whether any legal constraints foreclose arbitration of those claims. *See Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 396 (5th Cir. 2006) (citing *Mitsubishi Motors Corp.*, 473 U.S. at 628, 105 S. Ct. 3346). Courts must "apply the federal policy favoring arbitration when addressing ambiguities regarding whether a question falls within an arbitration agreement's scope, but . . . do not apply this policy when determining whether a valid agreement exists." *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008). *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475–76, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989); *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) (citing *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)); *Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002). The determination of whether a party is bound by an arbitration agreement is included within the broader issue of whether the parties agreed to arbitrate. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003) (citing *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 95 (2d Cir. 1999)). "The purpose of the FAA is to give arbitration agreements the same force and effect as other contracts—no more and no less." *Washington Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citing 9

U.S.C. § 2); *see Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1064 (5th Cir. 1998) ("[a]rbitration is a matter of contract between the parties").

### ii.   Subject Arbitration Provision

As stated above, Plaintiffs hired the O'Quinn Firms to represent them in silica-related claims; this relationship was formed by the Agreements, which hired the O'Quinn Firms on a contingency fee basis and issued the O'Quinn Firms powers of attorney to represent Plaintiffs in any and all claims against the silicosis defendants. These Agreements provide in pertinent part that each Plaintiff "hereby retains and employs [John M. O'Quinn & Associates, L.L.P.] to sue for and recover all damages and compensation to which [each Plaintiff] may be entitled as well as to compromise and settle all claims arising out of **ALL INJURIES AND DAMAGES RELATED TO SILICOSIS AND/OR ANY OTHER TYPE OF INJURY DERIVED FROM SILICOSIS DUST EXPOSURE.**" *See* Agreements [28-1] ¶ 1.01 (emphasis in original). The Agreements contain the following arbitration provision:

> Any and all disputes, controversies, claims[,] or demands arising out of or relating to (1) this Agreement or (2) any provision hereof or (3) the providing of services by [John M. O'Quinn & Associates, L.L.P.] to [Plaintiffs] or (4) the relationship between [John M. O'Quinn & Associates, L.L.P.] and [Plaintiffs], whether in contract, tort[,] or otherwise, at law or in equity, for damages or any other relief, shall be resolved by binding arbitration pursuant to the [FAA] in accordance with the Commercial Arbitration Rules then in effect with the American Arbitration Association.

*Id.* ¶ 10. The arbitration provision further states that any aggrieved Plaintiff must "submit his/her claims or demands to binding arbitration pursuant to [these provisions]" and that "[a]ny such arbitration proceeding shall be conducted in Harris County, Texas." *Id.* The heading of the first page of the Agreements contains the following statement in boldface, capital letters: "**THIS CONTRACT IS SUBJECT TO ARBITRATION UNDER THE FEDERAL**

ARBITRATION ACT AND THE TEXAS GENERAL ARBITRATION STATUTE." *Id.* at

1. The Agreements include a signature page wherein each Plaintiff signed a statement certifying

and acknowledging that he or she had the opportunity to read the Agreement and voluntarily

entered into the same fully aware of its terms and conditions. *Id.* at 8.

### iii. Interplay Between Agreement to Arbitrate Arbitrability and Non-Signatories

The United States Supreme Court has drawn a distinction between questions of

substantive arbitrability (addressing the existence, enforceability, and scope of an agreement),

which courts generally decide, and procedural arbitrability (addressing the construction and

application of limits on the agreement), which arbitrators generally decide. *See BG Grp., PLC v.*

*Republic of Arg.*, ——U.S. ——, ——, 134 S. Ct. 1198, 1206–1207, 188 L. Ed. 2d 220 (2014);

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 81, 123 S. Ct. 588, 154 L. Ed. 2d 491

(2002).

In the case *sub judice*, the O'Quinn Firms and Treece argue that the subject arbitration

provision refers the issue of substantive arbitrability to the arbitrator, not the Court. Plaintiffs

make no argument to the contrary. Although Laminack did not file a response to the arbitration

motion, he argued in his motion to dismiss for lack of personal jurisdiction, which was pending

before the Court when the arbitration motion was filed, that he was not a party to the Agreements

and was merely a corporate agent of the O'Quinn Firms signing the Agreements on behalf of the

O'Quinn Firms only.

" 'When deciding whether the parties agreed to arbitrate a certain matter (including

arbitrability), courts generally . . . should apply ordinary state-law principles that govern the

formation of contracts.' " *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 314 n.3 (5th Cir. 2011)

(quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d

985 (1995)). In this case, the Agreements expressly provide that Texas law applies to the construction of "the rights, duties[,] and obligations of [each Plaintiff] and of [John M. O'Quinn & Associates, L.L.P.] regarding [John M. O'Quinn & Associates, L.L.P.'s] representation of [each Plaintiff] and regarding anything covered by th[e] Agreement[s]." Agreements [28-1] ¶ 9. This point is not disputed. The Court finds that in this case Texas contracts law applies.

The question of arbitrability is generally a gateway matter to be determined by a court, rather than an arbitrator. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009); *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005). "The question of arbitrability encompasses what claims may be submitted to arbitration and who can be bound to an arbitration agreement." *Leshin v. Oliva*, No. 04-14-00657-CV, 2015 WL 4554333, at *5 (Tex. App. July 29, 2015) (citing *Howsam*, 537 U.S. at 83, 123 S. Ct. 588; *First Options of Chi., Inc.*, 514 U.S. at 943–44). " 'Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter.' " *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (quoting *First Options of Chi., Inc.*, 514 U.S. at 943, 115 S. Ct. 1920). "We will not assume that the parties agreed to arbitrate arbitrability '[u]nless the parties clearly and unmistakably provide otherwise.' " *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)).

By the express terms of the subject arbitration provision contained in the Agreements,

> any and all disputes, controversies, claims[,] or demands arising out of or relating to (1) this Agreement or (2) any provision hereof or (3) the providing of services by [John M. O'Quinn & Associates, L.L.P.] to [Plaintiffs] or (4) the relationship between [John M. O'Quinn & Associates, L.L.P.] and [Plaintiffs], whether in contract, tort[,] or otherwise, at law or in equity, for damages or

> any other relief, shall be resolved by binding arbitration pursuant
> to the [FAA] in accordance with the Commercial Arbitration Rules
> then in effect with the [AAA].

Agreements [28-1] ¶ 10.

The O'Quinn Firms and Treece specifically argue that the language in the arbitration agreements requiring "binding arbitration . . . in accordance with the Commercial Arbitration Rules then in effect with the [AAA]" confers the issue of arbitrability to the arbitrator, not the Court. *See id.* The Fifth Circuit has held that similar language in an arbitration agreement, requiring "arbitration administered by the [AAA] under its Commercial Arbitration Rules in effect at the time such arbitration is commenced," incorporated the AAA Commercial Rules into the agreement. *See Rain CII Carbon, LLC v. ConocoPhillips Co.,* 674 F.3d 469, 472–73 (5th Cir. 2012); *see also Petrofac, Inc.,* 687 F.3d at 675 (arbitration agreement providing that arbitration would be conducted by the AAA under its Construction Industry Arbitration Rules "expressly incorporated . . . the AAA rules").

AAA Rule 7 states: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA, COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES, RULE 7, *available at* http://adr.org/aaa/faces/rules (last visited March 17, 2017). The Fifth Circuit stated in *Petrofac, Inc.*: "We agree with most of our sister circuits that the express adoption of these rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac, Inc.,* 687 F.3d at 675. *Accord Fallo v. High-Tech Inst.,* 559 F.3d 874, 878 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.,* 466 F.3d 1366, 1372–1373 (Fed. Cir. 2006); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1332–1333 (11th Cir. 2005); *Contec Corp. v. Remote*

*Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005). *Contra Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 780 (10th Cir. 1998).

Although the Texas Supreme Court has not yet addressed the issue, other Texas state courts have held that similar broad arbitration clauses expressly incorporate rules giving the arbitrator the power to rule on his or her own jurisdiction and to decide questions of substantive arbitrability and present clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See Gilbert v. Rain & Hail Ins.*, No. 02-16-00277-CV, 2017 WL 710702 at *3, *4 (Tex. App. Feb. 23, 2017); *Jody James Farms, JV v. The Altman Grp., Inc.*, 506 S.W.3d 595, 599–600 (Tex. App. 2016), *reh'g denied* (Dec. 13, 2016); *Rent-A-Ctr. Tex., L.P. v. Bell*, No. 09-16-00085-CV, 2016 WL 4499093, at *4, *5 (Tex. App. Aug. 25, 2016); *T.W. Odom Mgmt. Servs., Ltd. v. Williford*, No. 09-16-00095-CV, 2016 WL 4487883, at *4 (Tex. App. Aug. 25, 2016); *Schlumberger Tech., Corp. v. Baker Hughes Inc.*, 355 S.W.3d 791, 802–03 (Tex. App.-Houston [1st. Dist.] 2011, no pet.); *Saxa Inc. v. DFD Architecture Inc.*, 312 S.W.3d 224, 230–31 (Tex. App.-Dallas 2010, pet. denied); *Haddock v. Quinn*, 287 S.W.3d 158, 172 (Tex. App.-Fort Worth 2009, pet. denied).

However, "[i]n cases involving non-signatories, [such as the case *sub judice*,] courts do not consider the terms of the arbitration agreement as any evidence when looking for 'clear and unmistakable evidence' as to whether parties agreed to arbitrate the issue of arbitrability." *See Leshin*, 2015 WL 4554333, at *6 (citing *First Options of Chi., Inc.*, 514 U.S. at 943, 115 S. Ct. 1920) (additional internal citations omitted). "To constitute evidence in cases involving non-signatories, we must look at whether the parties to the dispute before the court . . . clearly and unmistakably agreed to arbitrate the issue of arbitrability, rather than whether the parties to the contract containing the arbitration clause . . . agreed to arbitrate the issue of arbitrability." *Id.*

"[T]he gateway issue of determining whether a non-signatory is a party to the arbitration agreement [is] for the trial court—not the arbitrator—to determine." *Id.* at *7.

In the case *sub judice*, the O'Quinn Firms and non-signatory Treece seek to enforce the arbitration agreement with signatory Plaintiffs and all Defendants—whether signatories or not. The signatory Plaintiffs oppose the arbitration. According to signatory Plaintiffs, signatory Defendant John M. O'Quinn & Associates, L.L.P., as well as Defendants John M. O'Quinn & Associates, PLLC, John M. O'Quinn, P.C., and John M. O'Quinn Law Firm PLLC are various aliases and entities of the O'Quinn Firms. Defendants maintain that John M. O'Quinn & Associates, LLP, John M. O'Quinn, PC, and John M. O'Quinn Law Firm, PLLC no longer exist, but that John M. O'Quinn was the sole owner and/or member of all of the firms; Defendants further maintain that the correct name for the O'Quinn Firms is now John M. O'Quinn and Associates, PLLC d/b/a The O'Quinn Law Firm. Thus, it appears to the Court that for purposes of this analysis, the O'Quinn Firms are signatories to the Agreements. Thus, the non-signatory Defendants are Decedent John M. O'Quinn, Laminack, and Manji, who were attorneys in the O'Quinn Firms; as well as Danziger, a law firm that referred some of the Plaintiffs to the O'Quinn Firms.

With all of the foregoing in mind, the Court turns to examine the issue before it in this case: whether all parties in the case, both signatories and non-signatories, agreed to arbitrate arbitrability. The Court "must conduct an independent review of whether there are any applicable theories in which a court could compel [the] non-signatory [Defendants] to arbitrate," *see id.*, keeping in mind that " 'questions of arbitrability must . . . be addressed with a healthy regard for the federal policy favoring arbitration,' " *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 612 (5th Cir. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1,

24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).

After reiterating in *Leshin* that the issue of whether the parties agreed to arbitrate arbitrability is a matter of contract law, the Texas Court of Appeals provided a list of items which do <u>not</u> constitute evidence supporting that a non-signatory agreed to arbitrate arbitrability: (1) "evidence that an individual signed the arbitration agreement as an agent in his representative capacity"; (2) "evidence that the arbitration agreement references the AAA Commercial Arbitration Rules, and the fact that those rules allow an arbitrator to decide his own jurisdiction"; and (3) evidence of "an agreement's 'successors and assigns clause.' " *Leshin*, 2015 WL 4554333, at *6. *See First Options of Chi., Inc.*, 514 U.S. at 942, 946–47, 115 S. Ct. 1920; *DK Joint Venture 1*, 649 F.3d at 314–19; *Elgohary v. Herrera*, 405 S.W.3d 785, 790–92 (Tex. App. 2013); RESTATEMENT (SECOND) OF AGENCY § 320. The Texas Court of Appeals further cautioned that neither the extent to which the language of the arbitration agreement is broad, nor its reference to the AAA Commercial Arbitration Rules, nor both facts considered together, are not clear and unmistakable evidence that the non-signatories, in their individual capacities, agreed to submit the gateway issue of arbitrability to the arbitrator. *Leshin*, 2015 WL 4554333, at *6. In another case, the Texas Court of Appeals stated that when considering whether non-signatories agreed to arbitrate arbitrability, courts may consider equitable theories that would be considered in the determination of whether non-signatories were otherwise bound to an agreement to arbitrate—a more involved substantive arbitrability determination than the threshold determination of whether the non-signatories agreed to submit the arbitrability question *itself* to arbitration, but nonetheless helpful in fleshing out the analysis of whether the requisite clear and unmistakable evidence of agreement to arbitrate arbitrability has been satisfied. *See Elgohary*, 405 S.W.3d at 793; *see also Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748

F.3d 249, 255 (5th Cir. 2014) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009) ("under the FAA, traditional principles of state law may allow an arbitration contract to be enforced by or against nonparties to the contract through a number of state-law theories, including equitable estoppel")); *DK Joint Venture 1*, 649 F.3d at 314 (quoting *Bridas*, 345 F.3d at 356) (" '[o]rdinary principles of contract and agency law may be called upon to bind a non[-]signatory to an [arbitration] agreement whose terms have not clearly done so' "). Because the non-signatory Defendants—by definition—did not sign the Agreements, it follows that the language of the actual Agreements is not helpful to the analysis of whether the non-signatory Defendants agreed to its terms.

The Court first sets out the factors it cannot consider in its analysis. In applying the existing applicable law to this case, because signing a contract in a representative capacity does not bind the individuals who do so, the fact that one or more of the attorneys of the O'Quinn Firms may have actually signed the Agreements is not evidence that those attorneys agreed to arbitrate arbitrability. Further, the fact that the Agreements incorporate the AAA rules is not evidence the non-signatories agreed to arbitrate arbitrability, nor is the fact that the arbitration provision is broad in scope,[6] nor are the two facts considered together. And finally, even if the Agreements contained a "successors and assigns" clause, that also is not evidence the non-

---

[6] Under Texas law, "[a]n arbitration clause is broad where it provides for arbitration of 'any dispute arising between the parties,' 'any controversy or claim arising out of or relating to the contract thereof,' or 'any controversy concerning the interpretation, performance[,] or application of the contract.' " *Zaporozhets v. Court Appointed Receiver in Cause No. 12-DCV-199496*, No. 14-14-00143-CV, 2014 WL 5148151, at *8 (Tex. App. Oct. 14, 2014) (citing *Osornia v. AmeriMex Motor & Controls, Inc.*, 367 S.W.3d 707, 712 (Tex. App.-Houston [14th Dist.] 2012, no pet.)). Based on the foregoing, the subject arbitration provision in the case *sub judice* is broad in scope. *See Cedillo v. Immobiliere Jeuness Establissement*, 476 S.W.3d 557, 562 (Tex. App. 2015), *reh'g overruled* (Nov. 3, 2015), *review denied* (Jan. 29, 2016) (arbitration clause in lawyer-client representation agreement containing language "[a]ny disputes arising out of the relationship between Firm and Client shall be submitted to binding arbitration" was broad in scope); *Zaporozhets*, 2014 WL 5148151, at *8 (agreement requiring "any dispute, controversy or claim aris[ing] in connection with the performance or breach of this agreement" to be arbitrated was "a broad provision"); *Glassell Producing Co. v. Jared Res., Ltd.*, 422 S.W.3d 68, 78 (Tex. App.-Texarkana 2014, no pet.) (arbitration clause requiring arbitration of claims "relating to or in connection with" was properly interpreted broadly). *See also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 693, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010) ("any dispute arising from" language sweeps broadly in scope)

signatories agreed to arbitrate arbitrability. *See First Options of Chi., Inc.*, 514 U.S. at 942, 946–47, 115 S. Ct. 1920; *DK Joint Venture 1*, 649 F.3d at 314–19; *Leshin*, 2015 WL 4554333, at *6; *Elgohary*, 405 S.W.3d at 790–92. Instead, guided by Texas case law, the Court examines the equitable theories concerning non-signatories who may be compelled to arbitration. *See Elgohary*, 405 S.W.3d at 793.

Texas and federal law recognize six theories under which a court could compel a non-signatory to arbitrate: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary. *See The Rice Co. (Suisse), S.A. v. Precious Flowers Ltd.*, 523 F.3d 528, 536–37 (5th Cir. 2008) (quoting *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006) (citing *Bridas*, 345 F.3d at 355–56)); *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015); *Elgohary*, 405 S.W.3d at 793.

The O'Quinn Firms and Treece maintain that the arbitration agreements are binding against all Defendants in this case, who would otherwise have no connection to Plaintiffs except through the Agreements and reference direct benefits estoppel as a theory supporting the binding of signatories and non-signatories to the arbitration agreement. Plaintiffs argue that direct benefits estoppel does not apply to this case, but otherwise do not argue that the Agreements cannot be enforced against non-signatories.

Plaintiffs argue correctly that the specific theory of direct benefits estoppel does not apply to the case. "Direct-benefit estoppel involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Jones v. Singing River Health Servs. Found.*, No. 16-60263, 2017 WL 65384, at *2 (5th Cir. Jan. 5, 2017) (quoting *Hellenic Inv.*

*Fund, Inc.*, 464 F.3d at 517–18) (internal quotation marks omitted). Under direct benefits estoppel, " 'a non[-]signatory cannot sue under an agreement while at the same time avoiding its arbitration clause.' " *Janvey*, 847 F.3d at 242–43 (quoting *Graves v. BP Am., Inc.*, 568 F.3d 221, 223 (5th Cir. 2009)). Direct benefits estoppel by its explicit definition is not applicable to the case *sub judice*, which does not involve non-signatories who embraced the benefits of the contract but now seek to repudiate the arbitration agreement within it. Instead, as stated above, the signatory Defendant who embraced the benefits of the contract now seeks to compel arbitration pursuant to the contract with all non-signatory Defendants and signatory Plaintiffs, and the signatory Plaintiffs oppose the arbitration.

The equitable theory most applicable to this case is the "intertwined claims" theory of estoppel. "The 'intertwined claims' theory governs motions to compel arbitration when a signatory-plaintiff brings an action against a non[-]signatory-defendant asserting claims dependent on a contract that includes an arbitration agreement that the defendant did not sign." *Id.* at 242 (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527–28 (5th Cir. 2000)). "Intertwined claims estoppel involves 'compel[ling] arbitration when a non[-]signatory defendant has a "close relationship" with one of the signatories and the claims are "intimately founded in and intertwined with the underlying contract obligations." ' " *Hays*, 838 F.3d at 610 (quoting *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 193–94 (Tex. 2007) (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995))). "It applies when there is a tight relatedness of the parties, contracts, and controversies." *Id.* (internal quotation marks and citation omitted). In *Hays*, the Fifth Circuit held as a matter of first impression that although Texas had not explicitly recognized the theory of intertwined claims estoppel, "the Texas Supreme Court, if faced with the question, would adopt intertwined claims

estoppel"; the Fifth Circuit found that intertwined claims estoppel applied to the case, reasoning that the plaintiffs' claims were urged against signatory and non-signatory defendants as a single unit showing the two were closely related and that the claims were intertwined with the underlying contractual obligations of the agreement. *Id.* at 612–13.

In the case *sub judice*, as in *Hays*, Plaintiffs' factual allegations against the signatory and non-signatory Defendants are practically indistinguishable. *See id.* at 613. Plaintiffs allege the claims are brought against "the O'Quinn Law Firm and related entities and persons" and that "arise[] out of the malfeasance committed by the O'Quinn Law Firm ('O'Quinn' or the 'Firm'), its attorneys, and co-counsel during the representation of thousands of clients who were diagnosed with silicosis and/or silica-related diseases." Pls.' State-Ct. Compl. [2] ¶¶ 13–14. Plaintiffs further allege that Decedent John M. O'Quinn, Laminack, and Manji, as attorneys in the O'Quinn Firms, participated in the O'Quinn Firms' legal malpractice/negligence, gross negligence, breach of fiduciary duty, breach of contract, constructive fraud, fraud, negligent misrepresentation, and negligent supervision.

Plaintiffs' allegations indicate the extent to which their claims are intertwined with the with the underlying Agreements, for instance: that "[a]n attorney client relationship existed between Plaintiffs, O'Quinn, the Firm's attorneys and the referral lawyers," *id.* ¶ 54; that "Mr. O'Quinn was the sole owner of the Firm and was responsible for the supervision of the associates and partners at O'Quinn," *id.* ¶ 62; that "Laminack was the managing attorney of the mass tort division of the [F]irm" and was also "personally responsible to see that Plaintiffs' underlying silicosis lawsuits were handled properly by the lawyers at the Firm," *id.*; that "[t]his specific case arises out of the malfeasance committed by [Defendants] during the representation of thousands of clients who were diagnosed with silicosis and/or silica-related diseases," *id.* ¶ 14;

24

that Plaintiffs hired Defendants to represent them in their silica-related claims, *id.* ¶ 15; that their relationship was based on the subject Agreements, *id.* ¶ 17; that "Defendants owed Plaintiffs numerous duties of care and conduct as a matter of law" due to their lawyer-client relationship, *id.* ¶ 15; that Defendants breached these duties by improperly billing Plaintiffs for medical-related charges and referral fees, *id.* ¶ 21; that Defendants improperly handled settlement proceeds and wrongfully retained the same for their own use, *id.* ¶¶ 25–27; that Defendants improperly charged Plaintiffs 3% of their general expenses before Defendants would release settlement funds to Plaintiffs, *id.* ¶ 28; that Defendants "unreasonably increased the expenses in the silicosis cases through carelessness and disregard," *id.* ¶ 32; that Defendants "committed numerous errors while processing a number of the settlements with the [s]ilicosis [d]efendants," *id.* ¶ 33; that Defendants improperly handled settlements, *id.* ¶¶ 34, 28–39, 41; that Defendants "continuously permitted Plaintiffs' claims to be wrongfully dismissed against a number of [s]ilica [d]efendants," *id.* ¶ 35; that Defendants "wholly failed to respond to" motions for summary judgment filed by numerous silicosis defendants, *id.* ¶ 36; and that Defendants "set about a course of conduct to destroy, shred[,] and alter documents contained in all of the [s]ilicosis [c]lients' files, including Plaintiffs' [files]," *id.* ¶ 47.

The foregoing allegations demonstrate that Plaintiffs' claims all arise out of or relate to the attorney-client relationship between Plaintiffs and the O'Quinn Firms and its attorneys that was formed by the Agreements. *See id.* ¶ 56; *see also Greenberg Traurig, LLP v. Nat'l Am. Ins. Co.*, 448 S.W.3d 115, 122 (Tex. App. 2014) (claims for negligence, legal malpractice, and breach of fiduciary duty were based on defendant's legal representation of plaintiff, which arose out of engagement agreement); *In re Hartigan*, 107 S.W.3d 684, 687, 691 (Tex. App. 2003) (plaintiff's legal malpractice claim "necessarily arose from [the attorney's] representation of

[plaintiff] under the attorney-client contract"). The Court finds that the O'Quinn Firms, Decedent John M. O'Quinn, Laminack, and Manji agreed to arbitrate arbitrability.

The real distinction in Plaintiffs' allegations occurs when referencing some of the Plaintiffs' interactions with referring law firm, Danziger, and those Plaintiffs' initial understanding that Danziger would represent them in their silicosis litigation only to later discover that their claims were referred to the O'Quinn Firms. *See* Pls.' State-Ct. Compl. [2] ¶¶ 16–17. If any line can be drawn between the Defendants, it is to exclude referring firm Danziger from the purview of the Agreements. Based on the foregoing, the Court finds that all parties in the case except referring firm Danziger clearly and unmistakably agreed to allow the arbitrator to decide the issue of arbitrability.

Generally, the Court would analyze whether the parties had a valid agreement to arbitrate, whether the claims in the case were within the scope of the arbitration agreement, and whether any defenses to arbitration have been proven. However, given that the parties have agreed to arbitrate arbitrability, those issues of substantive arbitrability, as well as issues concerning procedural arbitrability, are for the arbitrator to decide.

### C. Manji's Motion to Retain Claims Against Him with Claims Against O'Quinn Firms

Manji maintains in his motion to retain claims [54] that although he does not take a position on the motion to compel arbitration, the Court should retain the claims against him with those against the O'Quinn Firms. Manji argues that if the arbitration clause is held to apply to the O'Quinn Firms, it must also apply to him as an employee of the O'Quinn Firms. Plaintiffs have provided no argument to the contrary. The Court finds that due to the reasoning expressed in the Court's discussion of "intertwined claims" theory of estoppel above, Manji's motion should be granted. Because the Court has determined that all Defendants except Danziger

clearly and unmistakably agreed to arbitrate the issue of arbitrability, the claims against all Defendants except Danziger shall be sent to arbitration. The only issue remaining for the Court to decide is whether the case should be dismissed or stayed pending arbitration.

### D. Motion for Stay or Dismissal Due to Arbitration

"[U]pon being satisfied that the issue involved in such suit . . . is referable to arbitration under such an agreement," a court "shall . . . stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3. This Court has discretion to dismiss a case in favor of arbitration, *see Fedmet Corp. v. M/V Buyalyk*, 194 F.3d 674, 676 (5th Cir. 1999); "[t]he weight of authority clearly supports dismissal of a case when all of the issues raised in the district court must be submitted to arbitration," in which case "retaining jurisdiction and staying the action [would] serve no purpose," *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992). However, in the case *sub judice*, the claims against Danziger may be litigated without arbitration. Therefore, the Court finds that a stay, not dismissal, of the action is proper.

### III.    *Conclusion*

In sum, the Court finds as follows: the motion to dismiss [26] for lack of personal jurisdiction filed by Defendant Richard M. Laminack shall be DENIED; the motion to dismiss the action or, in the alternative, to compel arbitration and stay the case [28] filed by Defendants John M. O'Quinn & Associates, PLLC d/b/a The O'Quinn Law Firm, John M. O'Quinn & Associates, L.L.P., John M. O'Quinn, P.C., John M. O'Quinn Law Firm PLLC, and T. Gerald Treece, Independent Executor of the Estate of John M. O'Quinn, Deceased, shall be GRANTED IN PART AND DENIED IN PART, specifically, granted with respect to the request to compel arbitration and stay the case, but denied with respect to the request to dismiss the case; the motion for a more definite statement and to dismiss fraud-based claims [30] filed by Defendants

John M. O'Quinn & Associates, PLLC d/b/a The O'Quinn Law Firm, John M. O'Quinn & Associates, L.L.P., John M. O'Quinn, P.C., John M. O'Quinn Law Firm PLLC, and T. Gerald Treece, Independent Executor of the Estate of John M. O'Quinn, Deceased, shall be DENIED AS MOOT; and Defendant Abel Manji's motion to retain claims against him with the claims against the O'Quinn Firms [54] shall be GRANTED.

This case shall be STAYED pending arbitration as to all Defendants in the case except Defendant Danziger & De Llano, LLP.

An order in accordance with this opinion shall issue this day.

THIS, the 31st of March, 2017.

_____
SENIOR U.S. DISTRICT JUDGE